HAROLD E. VICKERS, PLAINTIFF-RESPONDENT, v. TOWN-
SHIP COMMITTEE OF GLOUCESTER TOWNSHIP, ET
AL., DEFENDANTS-APPELLANTS.

Argued December 5, 1961—Decided May 7, 1962.

234

Mr. *William C. Gotshalk* argued the cause for the defendant-appellant (*Mr. Vincent L. Gallaher*, attorney).

Mr. *Milford Salny* argued the cause for the plaintiff-respondent (*Mr. Sidney D. Weiss*, on the brief).

The opinion of the court was delivered by

PROCTOR, J. In this proceeding plaintiff Harold E. Vickers challenges the validity of an amendment to the zoning ordinance of the defendant Gloucester Township. This amendment prohibits "Keeping, locating, establishing, maintaining or operating a trailer camp, trailer park * * *" in its industrial district.[1] After hearings, the Superior Court, Law Division, sustained the validity of the amendment. On plaintiff's appeal the Appellate Division reversed. 68 *N. J. Super.* 263 (1961). The township appeals to this court under *R. R.* 1:2-1(a).

On July 1, 1957 the township adopted a comprehensive zoning ordinance establishing Residence Districts "A," "B," "C," "D," a Business District, an Agricultural District and

---

[1] The Definitions section of the amendment to the ordinance provides:

"442: TRAILER, TRAILER-COACH or CAMP-CAR: Any unit which is, or may be, used for living, sleeping, or business purposes by one or more persons and that is equipped with wheels or similar devices used for the purpose of transporting said unit from place to place, whether it be self-propelled or otherwise, and whenever the word 'trailer' is used herein it shall mean and include 'trailer coach' and 'camp car' * * *

443: TRAILER CAMP or TRAILER PARK: Any place, area, lot or tract of land which is so designed or intended for placing or locating thereon a trailer, trailer-coach or camp-car, one or more, as above defined, other than a garage or other similarly enclosed type of building in which such vehicles may be placed."

an Industrial District. The ordinance enumerated the uses permitted within all residence, business and agricultural districts, not mentioning trailer camps. The section regulating uses within the industrial district was drafted in different form; it permitted lands to be used and buildings to be erected for any lawful purpose with the exception of 41 specified uses. Trailer camps were not among the barred uses. By the terms of the ordinance dwellings which conformed to the requirements of the "A" residence district were permitted in the industrial district, provided prior approval of the Board of Adjustment was obtained. "A" residence district houses were required to be "One-family detached dwellings" located on a lot not less than 75 by 125 feet with at least 800 square feet of usable first floor area.

On September 3, 1957 the township adopted an ordinance entitled "An Ordinance to Regulate and Control Trailers, Trailer Coaches, Camp Cars and Trailer Camps in the Township of Gloucester." (Trailer Ordinance.) The effect of this ordinance and the zoning ordinance was to repeal a 1947 trailer ordinance barring trailer camps in the entire township and to ban such camps in the residence, business and agricultural districts, but permit them in the industrial district. At present there are no trailer camps in the township.

In April 1959 this court decided *Napierkowski v. Township of Gloucester,* 29 *N. J.* 481, which concerned the validity of the zoning ordinance as it applied to trailers in residential districts. We held "the provisions of the zoning ordinance prohibiting the location of trailers in residence districts * * * bears a reasonable relationship to the purposes of zoning as outlined in *R. S.* 40:55–32, and should be upheld." *Id.,* at *p.* 496. We expressly left open the question of whether such uses could be completely excluded from the township. *Id.,* at *p.* 497.

On August 26, 1959 Vickers applied to the township for a permit to operate a trailer camp upon his ten acres of

industrially zoned land which he had purchased in November 1957. While this application was pending, he acquired ten additional acres of land across the road from his prior holdings but still within the industrial district. The Township Committee denied his application in a letter dated December 8, 1959. As a result, Vickers instituted an action in lieu of prerogative writ on December 30, 1959, wherein he alleged he had complied with the Trailer Ordinance requirements and sought a judgment compelling the township to grant him permission to operate his proposed trailer camp. In their answer, the defendants stated that plaintiff's application was denied because his plans did not meet the requisite health standards and that the granting of the permit would be in violation of the zoning ordinance, subdivision ordinance and building code.

Much of the testimony introduced by the plaintiff at the trial on March 17, 1960, concerned his compliance with the requirements of the State Department of Health. Plaintiff also introduced evidence as to the characteristics of the township, particularly the area surrounding his property. This area is almost entirely in the industrial district (an "A" residential district is not far from Vickers' lands) and is for the most part undeveloped. Several buildings ranging from dilapidated shacks to modest homes are situated in the immediate vicinity of plaintiff's property. There are no residential developments or industrial plants in this area, nor are there any between plaintiff's land and the Freeway which runs through the township and is about two miles west of the property. An expert called by plaintiff testified that plaintiff's land could be appropriately used as a trailer camp site and that such use would not have an adverse economic effect upon the neighborhood.

Apparently realizing during the course of the trial that his application and plans did not meet the required standards of the State Department of Health, plaintiff moved for an opportunity to amend his application and plans as submitted. The court granted plaintiff's motion and further

allowed the township to "take such administrative action and review what action they may be desirous of taking in the interim time, which means that the Court will hold this issue in abeyance until such time as those amendatory actions are taken on the part of both parties." The trial was adjourned for an unspecified period.

The plaintiff's amended plans were submitted to the Township Committee at a meeting held on April 1, 1960. At that meeting the Mayor announced that a "proposed amendment to the Zoning Ordinance to exclude trailer camps is being submitted to the Planning Board for its consideration and comment at its next meeting, to be held April 5, 1960." After this announcement the ' Committee meeting was adjourned until April 5, 1960, "to take up any action regarding such proposed zoning ordinance amendment, and any other things that may be considered at the adjourned meeting." At the Township Committee meeting held April 5, 1960, the amending ordinance barring trailer camps from the industrial district and an ordinance repealing the Trailer Ordinance were read for the first time. The Township Planning Board met and approved the amending ordinance on the same night. In a letter formally notifying the Township Committee of this action, the Planning Board stated:

"The Board believes that trailer camps do not contribute anything to the general appearance of the local scenery and do not enhance the use or value of the local real estate and, in fact, do have a directly opposite effect, that the areas where they may exist are prejudiced thereby, that real estate values instead of being preserved or enhanced, would be depreciated, that the establishment of such camps would retard and, perhaps, choke the development of real estate for the area. To permit trailer camps and camp sites would not be in the interest of the general welfare of the community. The Board, therefore, registers its approval of the amendment * * *"

This letter was read to the Township Committee at its next meeting which was held on April 22, 1960. At that meeting the zoning ordinance and the ordinance repealing the

Trailer Ordinance were read for the second time and adopted by the Township Committee. The minutes disclose the following:

"Mayor Yost, Mr. Harrison and Mr. McCann in reply to statements and questions raised by the members of the public, stated, in substance, that the Township Committee in presenting the ordinance to amend the zoning ordinance was taking into consideration the over all planning for the township, present and future, and that the purpose of the amendment was to protect property values, both present and future, which might be adversely affected by a trailer camp, because a trailer camp is not attractive in appearance and that consideration must be given to the effect that such appearance would have on the development of the area in particular and the township in general.

Mayor Yost further pointed out that the township was in the heart of the Delaware Valley expansion that is taking place and that the township is growing fast and planning is necessary to cope with such growth."

Since the result of the ordinances was to prohibit trailer camps throughout the township, plaintiff on May 5, 1960, filed a second complaint in lieu of prerogative writ demanding a judgment declaring the ordinances invalid and inapplicable to the use of his property as a trailer camp. In its answer the township contended it had the power to enact the ordinances under its zoning powers and general police powers.

The second action came to trial on June 20, 1960, before the same judge who heard the first case, and the actions were consolidated. The parties stipulated that plaintiff's amended plans satisfied the prerequisite health standards applicable to trailer camps, thus leaving as the primary question whether the township had the power to adopt the amendment prohibiting trailer camps from its industrial district, which in effect barred them from the entire township. Also in issue was the legal propriety of the procedure followed in adopting the amendment, the plaintiff contending the Planning Board did not have the opportunity to properly consider the amendment as required by *N. J. S. A.* 40:55–35.

The testimony, zoning map and photographs submitted at the trial showed that the township is in the main a rural community of about 23 square miles in Camden County. However, the nature of the township is rapidly changing, it being in the throes of expansion. The population has grown from 7,950 in 1950 to about 17,500 in 1960, and the number of houses has increased from 2,694 in 1955 to 4,113 as of September 1959. The bulk of this expansion is concentrated in the northern and western sections. The southern section, where plaintiff's lands are situated, includes several residential districts and a business district, but is for the most part relatively undeveloped. The township's sanitary land-fill area, where non-garbage refuse is disposed and promptly covered by earth, is located about 100 yards from plaintiff's land. Although most of the southern section is in the industrial district, one-family houses can be constructed in that district if the Board of Adjustment gives permission. In fact, home developers have purchased 500 acres within the industrial district and adjacent to plaintiff's property. Mayor Yost and Mr. Moffa, Chairman of the Planning Board, stated the township was continually considering changes in the existing zones in order to benefit the township. The record and zoning map indicate that certain areas which had been previously zoned residential, have recently been reclassified industrial. There was also testimony that the township, in an effort to eliminate blighted structures, had on February 8, 1960, appointed a Public Officer who is actively engaged in a program to rid the township of properties which are in "bad condition," including those located in the vicinity of plaintiff's land.

Mayor Yost testified that many factors motivated the township to prohibit trailers. He said:

"The Committee took many things into consideration; future over all planning of our Township; the acquisition of 500 acres of development ground bought by developers, adjacent to Mr. Vickers' property, also taking in connection with the Freeway, the other

sections of our Township are fairly well built up and the development is working further south.

\* \* \* \* \* \* \* \*

We feel that the trailers, as a general run, are unsightly, and couldn't see with the present growth, also with the view in mind of future growth of planning where trailers would add to it."

The trial court, after noting the expanding nature of the community, held that the challenged ordinances were valid because "this is a municipality where prohibition of trailer camps can be legislated," and it further held the adoption of the amendment accorded with the statutory procedure. The Appellate Division reversed, holding "the amendment of the zoning ordinance of April 22, 1960 must be set aside as an unreasonable and arbitrary exercise of the zoning power." It said, at *p.* 270:

"The entire picture presented very definitely gives the impression that the planned future of the township, as reflected by the high proportion industrial districts bear to the whole, does not contemplate that the township will become what is commonly called a 'residential town.' On the contrary it appears that the zoning power has been used in the hope of attracting industry.

\* \* . \* \* \* \* \* \*

Surely, in this vast rural area, there must be some portion in which the operation of trailer parks would be compatible with the scheme of zoning the township has seen fit to select, and yet would not adversely affect existing or future uses of property located anywhere in the township, and however zoned."

The Appellate Division further held the township was free to repeal its Trailer Ordinance and "its action in that regard will not be disturbed." In view of its disposition of the case, the Appellate Division found it unnecessary to pass upon the alleged procedural irregularity.

The parties agree the only issues on this appeal are: (1) In the circumstances, could the township through its zoning power totally exclude trailer camps from the municipality? and, (2) Were the procedural requirements of *N. J. S. A.* 40:55–35 met in the adoption of the zoning ordinance amendment?

As to the first issue, the township contends the zoning ordinance as amended represents a valid exercise of the municipality's power to "develop itself as an orderly and well integrated community," and that trailer camps with their accompanying disadvantages can only interfere with its planned growth. The plaintiff argues the township, although it can regulate the operation of trailer camps, cannot absolutely prohibit them, that such an attempt is invalid since it "goes beyond the essential objects of zoning." He asserts "There is everything to indicate that Gloucester Township is not the type of community where the absolute prohibition of mobile home parks is warranted."

Our Constitution empowers the Legislature to enact general laws under which municipalities may adopt zoning ordinances "limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State." *N. J. Const. Art. IV, Sec. VI, par. 2.* And our Constitution commands that all laws concerning local government, and zoning laws are in that class, be construed liberally in favor of municipal power. *N. J. Const. Art. IV, Sec. VII, par. 11.*

In *N. J. S. A.* 40:55–30 and *N. J. S. A.* 40:55–31 the Legislature has given municipalities extensive power to create districts and regulate structures and the use of land therein through zoning ordinances. The guiding purpose in exercising this power is set forth in *R. S.* 40:55–32 as:

"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value

of property and encouraging the most appropriate use of land throughout such municipality."

The role of the judiciary in reviewing zoning ordinances adopted pursuant to the statutory grant of power is narrow. The court cannot pass upon the wisdom or unwisdom of an ordinance, but may act only if the presumption in favor of the validity of the ordinance is overcome by an affirmative showing that it is unreasonable or arbitrary. *Kozesnik v. Township of Montgomery*, 24 *N. J.* 154, 167 (1957); see Cunningham, "Control of Land Use in New Jersey," 14 *Rutgers L. Rev.* 37, 48 (1959). By these standards which control judicial review, the plaintiff to prevail must show beyond debate that the township in adopting the challenged amendment transgressed the standards of *R. S.* 40:55-32. In other words, if the amendment presented a debatable issue we cannot nullify the township's decision that its welfare would be advanced by the action it took.

"It cannot be said that every municipality must provide for every use somewhere within its borders." *Fanale v. Borough of Hasbrouck Heights*, 26 *N. J.* 320, 325 (1958). The fact that a municipality is largely undeveloped does not impose a contrary obligation. Sound planning and zoning look beyond the present into what lies ahead in the hopes of the planners. "It requires as much official watchfulness to anticipate and prevent suburban blight as it does to eradicate city slums." *Lionshead Lake, Inc. v. Township of Wayne*, 10 *N. J.* 165, 173 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953).

This court has considered several cases in which a municipality's zoning ordinance was attacked as unreasonable because it prohibited certain structures or uses.

In *Duffcon Concrete Products, Inc. v. Borough of Cresskill*, 1 *N. J.* 509 (1949) this court held a municipality could through its zoning ordinance permit light industry and totally exclude heavy industry.

In *Lionshead Lake, Inc. v. Township of Wayne, supra,* this court sustained a zoning ordinance provision barring the construction anywhere in the township (which included residential, business and industrial districts) of dwellings containing less than 768 square feet of living area. After alluding to health factors, the court said, at *p.* 174:

"But quite apart from these considerations of public health which cannot be overlooked, minimum floor-area standards are justified on the ground that they promote the general welfare of the community and, as we have seen in *Schmidt v. Board of Adjustment of the City of Newark,* 9 *N. J.* 405 (1952), *supra,* the courts in conformance with the constitutional provisions and the statutes hereinbefore cited take a broad view of what constitutes general welfare. The size of the dwellings in any community inevitably affects the character of the community and does much to determine whether or not it is a desirable place in which to live."

In *Fischer v. Township of Bedminster,* 11 *N. J.* 194 (1952), this court upheld a zoning ordinance which placed most of the township in a residence zone with a minimum lot size of five acres for each residence. The court said, at *p.* 204: "As much foresight is now required to preserve the countryside for its best use as has been needed to save what could be salvaged of our cities."

In *Pierro v. Baxendale,* 20 *N. J.* 17 (1955), this court sustained a zoning ordinance barring motels from a municipality which included residential, business and industrial districts. In so doing, we reiterated the proposition that "general welfare" is a broad concept and noted that it includes "public convenience" and "general prosperity."

In *Fanale v. Borough of Hasbrouck Heights, supra,* the validity of the zoning ordinance prohibiting the construction of apartment houses anywhere in the borough was under attack. The borough was zoned for residence, business and industry. The plaintiff sought to construct an apartment house in the business district on a lot which contained a dilapidated residence. The plaintiff contended *inter alia* the ordinance was invalid because one and two-

family houses were permitted in the industrial zone, while apartment houses were excluded. In sustaining the ordinance, we said, at *p.* 328:

"True, as the ordinance now stands, one and two-family homes may be erected in those districts. Nonetheless, and apart from the unlikelihood of that development, a multi-family structure in an industrial setting would grossly accentuate the resulting problems. The matter is one of classification, and we cannot say a distinction between one and two-family houses as against multi-family ones even in industrial districts is devoid of reasonable factual support."

In *Napierkowski v. Township of Gloucester, supra,* the provisions of this township's zoning ordinance which prohibited trailers and trailer parks from the residential, business and agricultural districts were under attack. The plaintiff wanted to place a trailer on her four-acre tract for use as her permanent residence. Although the land was situated in a residential zone, the area about her plot was mainly rural and was likely to remain so for the reasonably foreseeable future. After noting that: (1) some states have upheld regulations limiting the time during which a trailer could remain in a municipality to short intervals thus making them strictly temporary abodes and effectively eliminating trailer parks which cater to trailers used as permanent residences; (2) other states have permitted municipalities to apply their house building codes to trailers, thus effectively barring all trailers since none could possibly comply; and (3) some states have permitted the unequivocal prohibition of trailers throughout the municipality, we said, at *p.* 493:

"The decisions elsewhere highlight the fact that the use of trailers as permanent residences present problems which are ofttimes inimical to the general welfare. * * * And from the point of view of aesthetic considerations (which are inextricably intertwined with conservation of the value of property) trailers may mar the local landscape."

We concluded that the Township of Glocester had the power to prohibit trailers from all residential districts, even though those districts include rural areas which will remain un-

developed for the reasonably foreseeable future. We said, at *p.* 494: "Zoning must subserve the long-range needs of the future as well as the immediate needs of the present and the reasonably foreseeable future. It is, in short, an implementing tool of sound planning."

It is necessary to look at the total picture to determine whether the township's ordinance violated the statutory zoning standards in the light of the above decisions. As in all zoning cases, the question is whether the requirements of the ordinance are reasonable under the circumstances. *Fanale v. Borough of Hasbrouck Heights, supra,* at *p.* 325.

It is clear the tide of suburban development has begun to engulf the rustic character of the township. Its population has more than doubled in the past ten years with a corresponding increase in the number of homes. There is every indication this markedly accelerated growth will continue; housing developers have acquired large tracts of land in the sparsely settled areas. While the record does not show any significant industrial development, the new Freeway and the Walt Whitman Bridge have recently opened up this particular section of south Jersey to the business and shipping centers of Philadelphia and Camden, and to the industrial and commercial areas along the Delaware River. See *Napierkowski v. Township of Gloucester, supra,* at *p.* 494. It is not unreasonable to anticipate that industry, creating new ratables which will help allay local tax problems, may be encouraged by sound planning and zoning to look favorably to this area for plant sites. Indeed, unless there is such planning and zoning, the municipality may suffer from the adverse effects of helter-skelter and deleterious property uses, thus discouraging industry from settling in the township. Industry may shun the disharmony resulting from discordant uses side by side.

Choosing to take advantage of the community benefits which can flow from thoughtful planning, the township in 1957 adopted its first comprehensive zoning ordinance and

recognized the difference between modern industrial development and unrestricted factory constructions. The ordinance excludes from the industrial district 41 nuisance type industries which were determined to be unsuitable to the kind of community planned. As to the permitted structures, there are restrictions as to lot size, percentage of area occupied by buildings, height of buildings and set-backs, and requirements for off-street parking and loading facilities. These provisions are in harmony with modern concepts of industrial planning which aim to promote an attractive industrial area, compatible in appearance with nearby residences. Much of the current industrial development in this State is in fact taking place in areas resembling parks where nuisance type plants are excluded and attractive architecture prevails. Such types of industry often lend to the prosperity of the entire municipality.

Trailer camps, because of their particular nature and relation to the public health, safety, morals and general welfare, present a municipality with a host of problems, and these problems persist wherever such camps are located. See *Zullo v. Board of Health, Woodbridge Tp.*, 9 *N. J.* 431 (1952); "Regulation and Taxation of House Trailers," 22 *U. Chi. L. Rev.* 738, 739 (1955); "Trailer Parks vs. The Municipal Police Power," 34 *Conn. B. J.* 285 (1960); "Regulation of Mobile Homes," 13 *Syracuse L. Rev.* 125 (1961). In *Fanale v. Borough of Hasbrouck Heights, supra*, we said, at *p.* 325: "Apartment houses are not inherently benign. On the contrary, they present problems of congestion and may have a deleterious impact upon other uses." This description is equally applicable to trailer camps. Clearly trailer camps bring problems of congestion with all their attendant difficulties. In the present case the plaintiff proposes to place each trailer on a 40 by 60 foot lot. The smallest lot upon which a one-family dwelling (the only type permitted in the zone) can be erected in the same zone is 75 by 125 feet. Therefore, in the same square area the township would have to cope with nearly four

times as many trailer families and motor vehicles as would be present if the tract were devoted to one-family houses. As we recognized in *Fanale,* at *p.* 328, a town may properly conclude that, because of the gross difference in the resulting problems, it will permit in its industrial zone the types of residences which do not foster congestion while excluding those which bring with them heavy concentration of population.

And if the township is to avoid the "deleterious impact" which one use may have upon other uses and encourage "the most appropriate use of land throughout such municipality," it must be concerned with the future as well as the present values of property. Our recent decisions have uniformly held, in conformance with the constitutional provisions and the zoning statutes hereinbefore cited, that "general welfare" should be given a broad interpretation. *Pierro v. Baxendale, supra; Fischer v. The Township of Bedminster, supra; Lionshead Lake, Inc. v. Township of Wayne, supra.* If the zoning ordinance is reasonably calculated to advance the community as a social, economic and political unit, it furthers the general welfare and therefore is a proper exercise of the zoning power. *Schmidt v. Board of Adjustment of the City of Newark,* 9 *N. J.* 405 (1952).

In the present case the township is seeking to create an attractive industrial zone. The purpose of the zoning ordinance is to guide the township in its transition from a *laissez faire* growth to a well-ordered community. The zoning ordinance does not presently envision exclusively industrial districts since it permits dwellings to be erected in those areas. However, these houses can only be one-family detached dwellings on a lot not less than 75 by 125 feet. The governing body determined that such houses would be compatible with industrial uses. It thought that trailer camps would strike a discordant note and be detrimental to property values, present and prospective, and retard the progress of the township. The governing body stated "a trailer camp is not attractive in appearance" and

considered this factor in reaching their conclusion. Aesthetics may properly be considered in establishing a zoning scheme "with a view of conserving the value of property and encouraging the most appropriate use of land." See *Napierkowski v. Township of Gloucester, supra,* at *p.* 494; *Pierro v. Baxendale, supra,* at *p.* 28; *Point Pleasant Beach v. Point Pleasant Pavilion,* 3 *N. J. Super.* 222, 225 (*App. Div.* 1949).

■■ The township has begun to feel the effects of its potential for extensive and rapid development, and has concluded that the presence of trailer camps would hamper this potential. It believes that the prohibition of trailer camps is in keeping with the orderly growth of the township and best serves the interests of the entire municipality in its development as a desirable place in which to work and live. Since, as this court has held, municipalities can properly determine that the construction of small houses, *Lionshead Lake,* apartment houses, *Fanale,* and motels, *Pierro,* may have an adverse effect upon other properties throughout those municipalities (including industrial · districts), and that living units which produce congestion can be excluded, we would be flying in the face of the broad powers granted to municipalities by the Constitution and zoning statutes as interpreted by our decisions if we held that the township in the present case must, against the will of its governing body, allow the construction and operation of trailer camps in its industrial district. Accordingly, we hold the plaintiff has failed to show the township acted unreasonably in amending its zoning ordinance to exclude trailer camps from its industrial district.

Since trailer camps are not permitted in the other districts, the effect of the amending ordinance prohibiting them in the industrial district is to bar them from the entire municipality. There are no trailer camps in the township at present. Plaintiff contends that total prohibition is illegal. However, we have held that a municipality need not provide a place for every use. *Fanale v. Borough of*

*Hasbrouck Heights, supra.* We do not think that a municipality must open its borders to a use which it reasonably believes should be excluded as repugnant to its planning scheme. It must be remembered that once a use is legally established, even though conditions impel a revision of the zoning ordinance and the use strikes a jarring note, it cannot be eliminated by such a revision under existing law. See *R. S.* 40:55–48. If through foresight a municipality is able to anticipate the adverse effects of particular uses and its resulting actions are reasonable, it should be permitted to develop without the burdens of such uses. In his inaugural address on January 16, 1962, Governor Hughes recognized the need for a "planned development" of communities. He said:

> "[A] balanced distribution of people, jobs and industries between our urban and suburban communities is essential for the revitalization of urban life *and the orderly growth of suburban* areas. We cannot stand by while the bright face of New Jersey is disfigured by decay of its cities *and a haphazard growth of its suburbs.*" (Italics supplied)

Our conclusion that the township had the authority to adopt the amendment is based upon the facts presented, the circumstances of the township today and its projected development. We have noted that the township is in a state of flux. Its ultimate character remains indeterminate. In fact, there have been several amendments to the zoning ordinance since its enactment in 1957 and the testimony indicates more are contemplated. We are not unmindful of the reported improvements in design and rising popularity of trailers and the accompanying increased need for trailer camps. Mays, "Zoning for Mobile Homes," *Journal of America Institute of Planners,* 204 (1961). McKeever, "The Motionless Mobile Home," 19 *Urban Land* 1 (*April* 1960); *Bartley, Mobile Home Parks and Comprehensive Community Planning, p.* 3 (1960); *Hodes and Roberson, The Law of Mobile Homes, p.* 3 (1957); Note, "Toward an Equitable and Workable Program of Mobile Home Taxa-

tion," 71 *Yale L. J.* 702 (1962). It may be that circumstances will change and trailers and trailer camps will be an appropriate use in some areas of the township. If at that time the provisions of the ordinance become unreasonable they may be set aside. As we said in *Pierro v. Baxendale, supra,* at *p.* 29, "If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed."

■ It is of no significance that plaintiff's proposed trailer camp would not be detrimental to his immediate neighborhood as it now exists. The validity of a zoning ordinance is not to be determined by reference to an individual parcel of land. *Fischer v. Township of Bedminster, supra,* at *p.* 205. Moreover, the township has embarked upon an active program designed to eliminate the blighted structures which are near plaintiff's property. We repeat what we said in *Napierkowski v. Township of Gloucester, supra,* at *p.* 494: "Zoning must subserve the long-range needs of the future as well as the immediate needs of the present and the reasonably foreseeable future." The township officials have a basis to expect plaintiff's neighborhood will not remain in its present run-down condition and they are justified in considering the envisioned betterment.

The only decision of an appellate court cited by the plaintiff to sustain his contention that total prohibition of trailer camps in a municipality is beyond the zoning power is *Gust v. Township of Canton,* 342 *Mich.* 436, 70 *N. W.* 2d 772 (*Sup. Ct.* 1955). There the court said, "The test of validity is not whether the prohibition may *at some time in the future* bear a real and substantial relationship to the public health, safety, morals or general welfare, but whether it does so *now.*" (Italics supplied.) 70 *N. W.* 2d 774, 775. This view is contrary to our concept of zoning which requires a looking beyond an immediate "now." *Napierkowski v. Township of Gloucester, supra,* at *p.* 494. Therefore, we are not persuaded by a result based on the philosophy of the court in *Gust.*

Plaintiff further contends that even if the township could exclude trailer camps, the adopted amendment is void because the Planning Board did not have the opportunity to give proper consideration to the matter as required by *N. J. S. A.* 40:55–35.

The amendment was introduced by a first reading at the Township Committee meeting on April 5, 1960. Shortly thereafter, a recess was called to enable the Committeemen who were also members of the Planning Board to attend the Board meeting being held in the same building. After a 45-minute recess the Committee meeting reconvened and it was orally reported that the Planning Board had approved the amendment during that period. This approval was formally communicated to the Committee in a letter dated April 5, 1960, and read at its April 22, 1960 meeting before final adoption of the amendment.

The Chairman of the Planning Board had received a copy of the proposed amendment on April 3, 1960. He discussed the matter informally with several members prior to the meeting of April 5, 1960. The exclusion of trailers and trailer camps had been a subject of frequent discussion prior to the *Napierkowski* decision in 1959, and even more so since then, but this specific amendment was considered formally by the Planning Board for only 45 minutes.

The plaintiff asserts the action of the Planning Board violated the essential principle of *N. J. S. A.* 40:55–35 because the Board did not take a reasonable time to consider the specific amendment, and that it was in effect "a mere rubber stamp."

*N. J. S. A.* 40:55–35 prescribes the procedure for amending a zoning ordinance. It provides in pertinent part:

"[N]o amendment or change shall become effective unless the ordinance proposing such amendment or change shall first have been submitted·to the planning board, when such board exists, for approval, disapproval or suggestions, and the planning board shall have a reasonable time, not less than thirty days, for consideration and report * * *."

■ The policy of the above provision is to afford the Planning Board a reasonable time, not less than 30 days, to perform its statutory function. However, it may act in less time and, if it does, the statutory prerequisite is met. *Wollen v. Fort Lee*, 27 *N. J.* 408, 417 (1958). The statute does not specify a minimum period of time during which the Board must consider the amendment. The reasonableness of the time allotted depends on the facts in each case. The amendment in the present case was not a long and complicated document couched in ambiguous language. On the contrary, it was short and easily understood. The subject matter was discussed by the Board "from time to time" prior to the approval of the specific amendment. In view of the circumstances here, we cannot say the action of the Board did not represent its considered judgment arrived at independently. It could have reasonably concluded it was as prepared to pass upon the amendment on April 5 as it would be at some later time.

In light of the above, we hold that the township zoning ordinance amendment barring trailer camps from its industrial district was a valid exercise of its zoning power and was adopted in conformity with the statutory requirements.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

HALL, J. (dissenting). The majority decides that this particular municipality may constitutionally say, through exercise of the zoning power, that its residents may not live in trailers—or in mobile homes, to use a more descriptive term. I am convinced such a conclusion in this case is manifestly wrong. Of even greater concern is the judicial process by which it is reached and the breadth of the rationale. The import of the holding gives almost boundless freedom to developing municipalities to erect exclusionary walls on their boundaries, according to local whim or selfish desire, and to use the zoning power for aims beyond its

legitimate purposes. Prohibition of mobile home parks, although an important issue in itself, becomes, in this larger aspect, somewhat a symbol.

The instant case, both in its physical setting and in the issues raised, is typical of land use controversies now current in so many New Jersey municipalities on the outer ring of the built up urban and suburban areas. These are municipalities with relatively few people and a lot of open space, but in the throes, or soon to be reached by the inevitable tide, of industrial and commercial decentralization and mass population migration from the already densely settled central cores. They are not small, homogeneous communities with permanent character already established, like the settled suburbs surrounding the cities in which planning and zoning may properly be geared around things as they are and as they will pretty much continue to be. On the contrary these areas are sprawling, heterogeneous governmental units, mostly townships, each really amounting to a region of considerable size in itself. Their present rural, semi-rural or mixed nature is about to change substantially and they are soon to become melded into the whole metropolitan area. Their political boundaries are artificial and hence of relatively little significance beyond defining one unit of local government. Their existing conglomeration of land uses is sectionally distributed—large or small scale agriculture, residences in separated communities and on good sized plots or acreage in the open country, business establishments in the populated sectors and along through highways, and perhaps a spot or two of industry much sought after to aid municipal tax revenues. Many differing land uses, both present and future, are and can be made comfortably compatible by reason of the distances involved and the varying characteristics of geographical sections. Present municipal services are not more extensive than necessary to serve a population scattered over a large territory. Increased facilities, especially schools, required to accommodate a sudden population growth of large propor-

tions must be provided almost solely at local expense, which in New Jersey means from additional taxation on real estate within the municipal boundaries. And it is elementary knowledge that small homes with children to be educated in local schools cannot pay their own way tax-wise.

Such municipalities, above all others, vitally need and may legally exercise comprehensive planning and implementing zoning techniques to avoid present haphazard development which can only bring future grief. They are entitled to aim thereby for a sound and balanced area, with varying uses confined to specified districts and appropriately regulated. They may even limit the pace of growth to coincide with the availability of the necessary additional facilities and services so as to minimize growing pains. See Fagin, "Regulating the Timing of Urban Development," 20 *Law and Contemporary Problems* 298 (1955). They do not have to permit an Oklahoma land rush or a Western boom town. They need not allow every land use wherever someone wants to put it or the property is suitable and, in accordance with a comprehensive plan, may reasonably restrict districts to a particular future use even though another use would be equally suitable. They would be well advised to plan with adjoining communities, especially for joint public services and facilities. Intercommunity planning is also best able to accommodate those categories of uses that ought not to be excluded everywhere, but which may be more desirably located in one municipality rather than another. Unfortunately, our statutory provisions for voluntary regional planning boards, *R. S.* 40:27–9 to 11, have been little used, if at all.

And this gets to the nub of what this, and similar cases, are really all about, *i. e.,* the outer limit of the zoning power to be enjoyed by these municipalities most in need of comprehensive authority. What action is not legitimately encompassed by that power and what is the proper role of courts in reviewing its exercise?

The inquiry involves important fundamentals. In the broad sense the considerations are well posed in Williams, "Planning Law and Democratic Living," 20 *Law and Contemporary Problems* 317 (1955):

"The main premises of American constitutional law represent a codification and institutionalization of the primary values of a democratic society—equality of opportunity and equality of treatment, freedom of thought and considerable freedom of action, and fairness. Under the American system, a more or less independent mechanism of judicial review is established to provide an independent check on whether specific governmental decisions conform to these standards. *While controversy has often raged about judicial action in other areas, it has always been recognized that it is an essential part of the judicial function to watch over the parochial and exclusionist attitudes and policies of local governments, and to see to it that these do not run counter to national policy and the general welfare.*

Constitutional law should serve to shed light upon thinking about local planning, by requiring those concerned to do what they should be doing anyway—to work out the relationship between planning the future environment and the great issues connected with human freedom and opportunity.

\*        \*        \*        \*        \*        \*        \*        \*

An intelligent application of constitutional law to the measures used in planning the environment will therefore force a searching inquiry into basic problems—and thus become in fact an excellent vehicle for getting at what is really involved in planning decisions. If such searching inquiries are to be undertaken, this means that no major problem in planning law can really be understood except by an analysis thereof in relation to the whole background of the changing physical, economic and social environment. In short, what is needed in planning law is a super-Brandeis-brief approach.

\*        \*        \*        \*        \*        \*        \*        \*

The leaders of liberal-democratic thought are all too often so confused with abstractions ('health, safety, morals and welfare,' 'character of the neighborhood,' etc.), so full of respect for local autonomy, and so fearful of judicial review generally, as to be unable to understand the implications of what is going on. It has not been generally realized that in many instances the problems arising in this field of constitutional law are closely akin to those involved in civil liberties law, and call for similar attitudes toward the exercise of governmental power." (Emphasis supplied) (at *pp.* 318, 319, 349–350).

Looking first at the judicial role in such matters, it may well be suggested there is nothing revolutionary or even

novel in the majority's approach, the formulation of the decision or even in what is said. True it is that the opinion flows smoothly, beginning with common principles and presumptions of constitutional and statutory validity, continuing through recital of a succession of prior decisions in this court, to the seemingly irresistible conclusion that the local action is beyond successful attack. But as I see it, the result of this judicial process goes so far off the mark here as to point up in bold relief the necessity to pause for reappraisal of some of what has gone before and at least to halt what I think has developed into a most improper trend.

The decision formula runs as follows: The 1947 Constitution requires that zoning enabling laws be construed liberally in favor of municipal power. Any local exercise of that power is presumed valid until overcome by an affirmative showing of unreasonableness. Judicial review is so narrow that this showing can never be made if even a "debatable issue" exists. Such an issue exists in this case. Therefore the local prohibition stands.

The majority's spelling out of the "debatable issue" falls into this syllogistic pattern: Developing municipalities need not provide for every use. Cited precedent supports the local right to exclude uses on broad grounds. Planning and zoning in growing municipalities must look ahead to anticipate and prevent blight and to provide for "the hopes of the planners." Any zoning ordinance provision by such a municipality is proper if only it furthers the "general welfare" of the particular municipality in isolation. It does so if, in the single view of a majority of the local governing body, it "is reasonably calculated to advance the community as a social, economic and political unit" or aids in making the community a desirable place in which to work and live. Trailer camps present problems, are unattractive in appearance ("aesthetics may properly be considered in establishing a zoning scheme"), and may be detrimental to present and prospective property values, thereby retarding the "progress" of a municipality. Moreover, once allowed

to exist, they become irremovable nonconforming uses with a permanent jarring note if future conditions impel zoning revision. Factually, since validity must be considered in the light of the particular circumstances, this township is in the path of growth potential and is presently in a state of flux. It is seeking the orderly development of a well integrated community. Its officials do not like the looks of trailer camps in industrial districts or anywhere else— they "are unsightly" and "do not contribute anything to the general appearance of the local scenery and do not enhance the use or value of the local real estate." Therefore their complete prohibition furthers the "general welfare" in the eyes of the local authorities. The court cannot go against their view.

As the first stone in building its thesis, the majority relies on the 1947 constitutional mandate, *Art.* IV, *Sec.* VII, *par.* 11, enjoining liberal construction of provisions in that document and of laws concerning local government. Analysis demonstrates that the mandate has no true application in this situation. It was intended to reverse the former rule of construction of municipal power which had required, as stated for example in *N. J. Good Humor, Inc. v. Bradley Beach,* 124 *N. J. L.* 162, 164–165 (*E. & A.* 1939), that

"[a]ny reasonable or fair doubt of the existence of the asserted power, or any ambiguity in the statute whence it springs, or those in *pari materia*, is to be resolved against the municipality, and the power is denied. Municipalities are to be confined within the limits that a strict construction of the grants of powers will assign to them."

See 1 *Proceedings of the New Jersey Constitutional Convention of* 1947 401. But municipalities are still governmental units carrying out only those state functions and duties delegated to them by the Legislature either expressly, by necessary or fair implication, or as incidental or essential to powers expressly conferred. The new constitutional provision did not create a new concept of limitless home rule or give omnipotence to a local government to do anything it desires without regard to the limits of the delegated power supposedly exercised. *Magnolia Development*

*Co., Inc. v. Coles,* 10 *N. J.* 223 (1952); *Fred v. Mayor and Council, Old Tappan Borough,* 10 *N. J.* 515, 518 (1952); *Grogan v. DeSapio,* 11 *N. J.* 308, 316–317 (1953); *Wagner v. Newark,* 24 *N. J.* 467, 476–478 (1957).

In land use regulation, the Legislature has specifically defined and delineated the objects and methods of municipal action in accordance with expressed standards. Liberal construction cannot be applied in such matters so as to "constitute an authorization for a municipality to exercise the powers therein conferred without compliance with the provisions and procedures therein described," many of which are for the protection of property owners, *Magnolia Development Co., Inc. v. Coles, supra* (10 *N. J.,* at *p.* 227), nor does it, speaking more generally, "connote an extension of the boundaries delineated by the statutory phraseology as commonly used," *Grogan v. DeSapio, supra* (11 *N. J.,* at *p.* 316). We are not here concerned with the physical scope of the zoning power, *cf. United Advertising Corp. v. Borough of Raritan,* 11 *N. J.* 144, 150 (1952), but rather with the propriety of its exercise in the light of the prescribed statutory scheme and standards and other inherent limitations. It is a misapplication of the constitutional mandate to utilize it, as the majority seems to do, for the purpose of glossing over or watering down the requisite inquiry as to reasonableness with reference to the particular action under review.

The other foundation stones of the majority's approach are the twin shibboleths of presumption of validity of municipal action and restraint on judicial review if the proofs do not overcome it "beyond debate." The trouble is not with the principles—if we did not have them, governments could not well operate at all—but rather with the perfunctory manner in which they have come to be applied. Undoubtedly influenced at the same time by loose application of the constitutional provision for liberal construction, *Lionshead Lake, Inc. v. Township of Wayne,* 10 *N. J.* 165, 172 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386,

97 *L. Ed.* 708 (1953), our courts have in recent years made it virtually impossible for municipal zoning regulations to be successfully attacked. Judicial scrutiny has become too superficial and one-sided.[1] The state of the trend is exemplified in the language of the majority that "if the amendment presented a debatable issue we cannot nullify the Township's decision that its welfare would be advanced by the action it took."

In passing, a further principle may be noticed which seems to have been lost sight of in recent zoning decisions: "the presumption of validity * * * is only a presumption and may be overcome or rebutted not only by clear evidence *aliunde,* but also by a showing on its face or in the light of facts of which judicial notice can be taken, of transgression of constitutional limitation or the bounds of reason." *Moyant v. Paramus,* 30 *N. J.* 528, 535 (1959). Accordingly, it seems only fair to private citizens seeking judicial determination of their rights to require the municipality, with all its resources, to assume the burden of going forward to justify its action when the challenged measure gives good possibility on the surface of going to a doubtful extreme.[2]

---

[1] One student of the subject, writing in the fall of 1959, finds that since liberality of application of the principles was stated so strongly in *Kozesnik v. Montgomery Township,* 24 *N. J.* 154, 167 (1957), this court has sustained the challenged ordinance in every case but one. Cunningham, "Control of Land Use in New Jersey by Means of Zoning," 14 *Rutgers L. Rev.* 37, 48. And the record has not changed substantially since.

[2] The instant case is a good example. At the inception, plaintiff, a single, small property owner, was seeking authority, on any possible basis, to use his particular land for a mobile home park, a then permissible use. The prohibitory ordinance amendment adopted in the middle of the litigation shifted the issue to the comprehensive one with which this dissent is concerned. His proofs—and the township's too, for that matter—are sparse on the meaningful aspects of the ultimate controversy. Undoubtedly he was without the facilities or financial means to marshal and present the many-sided evidence needed to make a telling attack and even come close to meeting the heavy burden the majority imposes upon him and others similarly situated.

While it has long been conventional for courts to test the validity of local legislation by the criterion of whether a fairly debatable issue is presented, and if so to sustain it, it makes all the difference in the world how a court deals with that criterion. Proper judicial review to me can be nothing less than an objective, realistic consideration of the setting—the evils or conditions sought to be remedied, a full and comparative appraisal of the public interest involved and the private rights affected, both from the local and broader aspects, and a thorough weighing of all factors, (with government entitled to win if the scales are at least balanced or even a little less so) Of course, such a process involves judgment and the measurement can never be mathematically exact. But that is what judges are for—to evaluate and protect all interests, including those of individuals and minorities, regardless of personal likes or views of wisdom, and not merely to rubber-stamp governmental action in a kind of judicial *laissez-faire*. The majority approach attaches exclusive significance to the view of the governing body that, in its summary opinion, the "welfare" of the municipality would be advanced. On this criterion it is hard to conceive of any local action which would not come within the "debatable" class.

The majority falls in line with a plainer expression of the same thought in two earlier cases upon which it relies —*Lionshead Lake, Inc. v. Township of Wayne, supra* (10 *N. J.* 165, concurring opinion) and *Pierro v. Baxendale,* 20 *N. J.* 17 (1955). In the latter the court said: "We are satisfied that at long last conscientious municipal officials have been sufficiently empowered to adopt reasonable zoning measures designed towards preserving the wholesome and attractive characteristics of their communities and the values of taxpayers' properties." (20 *N. J.*, at *p.* 29.) In the former: "[The attacked provision] constituted important legislative action representing the governing body's best judgment as to what zoning restrictions were required to promote the health, morals and general welfare of the

community as a whole. Decent respect for its problems and sincerity required that its action remain unimpaired in the absence of clear showing that it was arbitrary, unreasonable, or beyond the authority of the general Zoning Act." (10 *N. J.*, at *p.* 179.) I think it is basically wrong for a court to take this point of view. Municipal legislative action is always assumed to have been taken conscientiously, sincerely and honestly. The test of validity is certainly something much more than bad faith or corruption. ⌈Local officials, no matter how conscientious and sincere in their own minds, may be legally wrong in formulating into legislation what they think is best for their community. The only place that question can be tested and individual rights and privileges safeguarded is in the courts. The judicial branch does not meet its full responsibility when, as here, its concept of review gives unquestioning deference to the views of local officials.⌋

Turning to the way the majority looks at local zoning regulations from the substantive standpoint, it is asserted to be · enough, as has been indicated, that the "general welfare" of the community is advanced. And the definition of the term, taken from prior cases, is so broad—anything "reasonably calculated to advance the community as a social, economic and political unit," including "public convenience" and "general prosperity"—one could hardly conceive of any land use regulation which would not fulfill it, especially when the governing body's determination is so controlling. All the other purposes and criteria of valid zoning set forth in the enabling act, *R. S.* 40:55–32, seem to be written out as unnecessary and of no bearing. The result is an extension of local control in directions and for purposes, under the guise of zoning, which go beyond the legitimate aims of the power. We should not forget some fundamentals. Zoning is land use control by *physical* planning to bring about physical results for public, not private, welfare. It is not a device to be used to accomplish any and all purportedly desirable *social* results unrelated to the statutorily

stated purposes. The basic definition by the first authority in the field still holds good: "Zoning is the regulation by districts under the police power of the height, bulk and use of buildings, the use of land and the density of population." *Bassett, Zoning* 45 (1940). [The purpose "to promote * * * the general welfare" does not stand alone in the statute. Its meaning and scope must have some relation to the other specified standards and the whole authorized scheme. Certainly "general welfare" does not automatically mean whatever the municipality says it does, regardless of who is hurt and how much.]

And no matter how broadly the concept is viewed, it cannot authorize a municipality to erect a completely isolationist wall on its boundaries. This was early recognized in the foundation case of *Euclid v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926), where the court was careful to say: ["It is not meant by this, however, to exclude the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way."] 71 *L. Ed.*, at *p.* 311. Two of our own landmark decisions (one wonders what has lately happened to them) made it very plain, even though our zoning scheme is legislatively keyed to municipal lines, that validity of local use prohibitions is to be judged by, among other things, availability of other appropriate locations, *Duffcon Concrete Products, Inc. v. Borough of Cresskill*, 1 *N. J.* 509 (1949), and that one town's zoning should give due recognition to conditions across its boundaries, *Borough of Cresskill v. Borough of Dumont*, 15 *N. J.* 238 (1954). See Haar, "Regionalism and Realism in Land-Use Planning," 105 *U. Pa. L. Rev.* 515 (1957); Note, "Zoning Against the Public Welfare: Judicial Limitations on Municipal Parochialism," 71 *Yale L. J.* 720 (1962). Though the *Cresskill* cases dealt with built-up suburbs, their underlying philosophy is equally applicable to developing municipalities in a vast metropolitan complex. They stand for the proposi-

tion that "general welfare" transcends the artificial limits of political subdivisions and cannot embrace merely narrow local desires.

I have at least equal difficulty with the breadth of another major aspect of the majority's thesis—that the local power to zone is especially *carte blanche* when the municipality is a relatively virgin one, and in the path of metropolitan expansion. The specter of future blight and a present inward vision of what the municipality hopes or dreams of someday becoming or remaining seem enough to sanction most any restriction, however drastic or provincial. This is, of course, partly true, since such municipalities may validly exercise comprehensive planning and zoning powers in many ways to meet their peculiar problems, present and prospective. Reasonableness depends on particular circumstances and some of the techniques legitimately available to them might be invalid if applied to relatively small built-up municipalities with settled character. But the reverse is also true. *Euclid* long ago noted: "A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities." 71 *L. Ed.,* at *p.* 310. Some of the cases relied on by the majority—*Duffcon Concrete Products, Inc. v. Borough of Cresskill, supra* (1 *N. J.* 509) (a densely settled suburb may properly exclude industry, if it has some other place to go in the general area); *Fanale v. Borough of Hasbrouck Heights,* 26 *N. J.* 320 (1958) (such a community may say it has had enough of some problem-creating method of living); *Pierro v. Baxendale, supra* (20 *N. J.,* at *p.* 17) (it may keep transient motels at least out of its residential districts even though it allows dwellings to be used for boarding and rooming houses)—have little substantive pertinency in passing on the propriety of regulations in virgin territories.

Townships like Gloucester, with their vast areas of vacant land, have plenty of room in which to accommodate the variety of land uses people of all income levels and indi-

vidual desires may want to enjoy. Sound planning and zoning regulation by appropriate districts can easily make such uses compatible while avoiding detrimental impact on each other. The technique is to allow for differing uses by putting them in the right places and with accompanying restrictions. I am unconvinced that "adequate light and air," lessening "congestion in the streets," avoidance of "undue concentration of population," "safety from fire, panic and other dangers" and prevention of suburban blight reasonably require a minimum five-acre dwelling lot in 90% of a 24-square-mile township with a population of 1600, if that municipality is a growing one or about to be reached by the tide.[3]

In my opinion legitimate use of the zoning power by such municipalities does not encompass the right to erect barricades on their boundaries through exclusion or too tight restriction of uses where the real purpose is to prevent feared disruption with a so-called chosen way of life. Nor does it encompass provisions designed to let in as new

[3] The reference is to *Fischer v. Township of Bedminster*, 11 *N. J.* 194 (1952), also relied on by the majority. While the court used broad language, to be mentioned again shortly, the result of the case is supportable on the proofs set forth in the opinion. They showed a completely rural municipality, with land uses and population little changed from what they had been 122 years before. More important, it was said to be in the center of a group of municipalities having substantially the same characteristics and there is no indication given of the probability of a population invasion in the near future. All the expert evidence found the restriction reasonable under the circumstances. The court did say that changed conditions might make the approved restriction unreasonable at a later time. (11 *N. J.*, at *p.* 205).

I do not mean to urge by what I have said or am about to say that every sparsely populated township cannot zone to maintain, reasonably, present basic rural land uses, at least until growth reaches it. Many such areas are so far away from the metropolitan center and suburbs that any substantial change will not come or be threatened for many years. I speak only of those municipalities where substantial growth has begun or is so practically imminent that it cannot validly be held off by local legislative walls denominated as zoning.

residents only certain kinds of people,[4] or those who can afford to live in favored kinds of housing, or to keep down tax bills of present property owners. When one of the above is the true situation deeper considerations intrinsic in a free society gain the ascendency and courts must· not be hesitant to strike down purely selfish and undemocratic enactments. I am not suggesting that every such municipality must endure a plague of locusts or suffer transition to a metropolis over night. I suggest only that regulation rather than prohibition is the appropriate technique for attaining a balanced and attractive community. The opportunity to live in the open spaces in decent housing one can afford and in the manner one desires is a vital one in a democracy. [It seems contradictory to sustain so readily legislative policy at the state level forbidding various kinds of discrimination in housing, e. g., *Levitt & Sons, Inc.. v. Division Against Discrimination,* 31 *N. J.* 514 (1960), appeal dismissed 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed. 2d* 1515 (1960), and permitting the use of eminent domain and public funds to remove slums and provide decent living accommodations, e. g., *Ryan v. Housing Authority of Newark,* 125 *N. J. L.* 336 (*Sup. Ct.* 1940); *Wilson v. Long Branch,* 27 *N. J.* 360 (1958), cert. den. 358 *U. S.* 873, 79 *S. Ct.* 113, 3 *L. Ed. 2d* 104 (1958), and at the same time bless selfish zoning regulations which tend to have the effect of precluding people who now live in congested and undesirable city areas from obtaining housing ,

---

[4] That this kind of motivation was not entirely absent in the barring of mobile homes from Gloucester Township is indicated by the statement at oral argument of the township's counsel, during the course of discussion of the local reasons for the action, that people who lived in trailers were a shifting population without roots and did not make good citizens. Aside from the fact that such characterizations are today without true foundation, the statement is an example of frequently found resentment and distrust by present residents of newcomers, including renters, who vote on school budgets and the election of local officials with the power over municipal appropriations, but who do not pay real estate taxes directly or in sufficient amount to cover the cost of local services rendered to them.

within their means in open, attractive and healthy communities.

Lionshead (10 *N. J.*, at *pp.* 173–175), and *Fischer* in the breadth of some of its language (11 *N. J.*, at *pp.* 204, 205), rationalize such exclusionary results, as does the majority here, by reference to the statutory zoning purposes, *R. S.* 40:55–32, of "conserving the value of property" and "encouraging the most appropriate use of land" and in the name of preservation of the character of the community or neighborhood. I submit these factors are perverted from their intended application when used to justify Chinese walls on the borders of roomy and developing municipalities for the actual purpose of keeping out all but the "right kind" of people or those who will live in a certain kind and cost of dwelling. What restrictions like minimum house size requirements, overly large lot area regulations and complete limitation of dwellings to single family units really do is bring about community-wide economic segregation. It is a proper thing to exclude factories from residential zones to conserve property values and to encourage the most appropriate use of land throughout the municipality. It is quite another and improper thing to use zoning to control who the residents of your township will be. To reiterate, all the legitimate aspects of a desirable and balanced community. can be realized by proper placing and regulation of uses, as the zoning statute contemplates, without destroying the higher value of the privilege of democratic living. For a fuller discussion see Williams, "Planning Law and Democratic Living," 20 *Law and Contemporary Problems* 317 (1955); Haar, "Zoning for Minimum Standards: The Wayne Township Case," 66 *Harv. L. Rev.* 1051 (1953); Haar, "Wayne Township: Zoning for Whom—In Brief Reply," 67 *Harv. L. Rev.* 986 (1954).

We should not perpetuate or augment this fundamental error of *Lionshead*. Prohibition of mobile home parks is of a piece with absolute minimum house sizes there approved and the same reasoning is utilized here to support it.

Trailer living is a perfectly respectable, healthy and useful kind of housing, adopted by choice by several million people in this country today. Municipalities and courts can no longer refuse to recognize its proper and significant place in today's society and should stop acting on the basis of old wives' tales. A fair, modern appraisal is found in Note, "Toward an Equitable and Workable Program of Mobile Home Taxation," 71 *Yale L. J.* 702 (1962):

"Between 1951 and 1956 the mobile home population doubled; it currently totals over 3,000,000 persons. The number of mobile homes in use grew from 550,000 in 1953 to 1,200,000 in 1959. This figure has been augmented by mobile homes recently produced— produced at a rate which exceeds 10 per cent of the private single family housing starts in this country.

For many years communities viewed the house trailer as the source of at least three major problems: its presence was expected to blight surrounding areas, causing property values to fall; its occupants were often viewed as personally undesirable; and the municipal expense attributable to trailerites was expected to exceed the revenue which could be raised from them.

Community fear of blight can be traced to the low quality of both the early trailers and their parking facilities. Economic conditions of the 'thirties, followed by wartime housing shortages and rapid relocations of the labor force, pressed many thousands of unattractive trailers into permanent use. Often these units were without running water or sanitary facilities. There were no construction standards to insure even minimum protection against fire or collapse. They were parked in areas which were usually crowded, poorly equipped, and generally unsuited to residential use. As a result, conditions in these parks seldom exceeded minimum health and sanitation standards. The specter of such parks teeming with tiny trailers made community apprehension understandable. But substantial improvements in the quality of both mobile homes and park facilities may have undermined the bases for this antipathy today. The mobile home currently produced is an attractive, completely furnished, efficiently spacious dwelling for which national construction standards have been adopted and enforced by the manufacturers' associations. Some of today's parks are landscaped, and feature ample lots imaginatively arranged around paved streets. Recreation facilities—such as swimming pools, boat docks and playgrounds—found in high quality parks could be the envy of conventional housing developments. *Although many parks have yet to match such progress, communities have ample power to require improvement of existing facilities and to set high standards for future park construction. They need only exercise it.*

Community distaste for trailer dwellers personally developed at a time when the trailerites were often considered footloose, nomadic people unlikely to make any positive contribution to community life. The early trailer was used primarily by tourists and transient workers; the permanent residents who did use trailers were likely to be low income workers with temporary positions. Mobile homes, however, can no longer be said to be inhabited primarily by migratory paupers; according to recent surveys, the present occupations and incomes of their occupants vary widely. Skilled workers, many of whom are engaged in construction or mineral development, now seem to form the largest single group of mobile home owners. Many mobile homes are also used by military personnel, young couples, and retired persons. Even professional people, perhaps attracted by the comfort available in a high quality mobile home and park, perhaps by tax economies, currently represent a large segment of the mobile home population. With the increasing variety of occupational groups living in mobile homes has come a substantial upgrading in income level. In 1958, the median income of mobile home dwellers ($5,250) was approximately the same as the national average ($5,300). There seems little justification, therefore, for any continuing personal antipathy toward mobile home dwellers as a group." (Emphasis supplied) (at *pp.* 702–704)

In the face of these facts, it is arbitrary to permit the prohibition of mobile home parks completely in a municipality where they can be placed in appropriate districts and in which there is a need or demand for them. To hold otherwise would be to allow any method of housing to be outlawed by local whim. I cannot understand how, in a large and roomy township, a properly situated and regulated mobile home park can have a detrimental effect on the value of all the property in the township or on its overall attractiveness any more than industrial and commercial districts or even small lot housing developments.[5]

[5] It should be noted that, as we were advised at oral argument, the mobile home industry in this state now accepts the proposition that trailers properly belong in parks and may legitimately be barred by zoning as single dwellings on individual lots in residential zones. *Napierkowski v. Township of Gloucester*, 29 *N. J.* 481 (1959). The best modern planning thought seems to be that, since mobile home living is truly residential, parks should be situated in a residential type of environment and not in commercial and industrial districts. They are, in effect, a horizontal multi-residential use,—no more of a commercial venture than a rented garden apartment. The sug-

Moreover, the aesthetic warrant for the prohibition, additionally relied upon by the majority, is not a reasonable basis for the exercise of zoning power in this situation. Without getting into all the ramifications surrounding the difficult question of how and to what extent aesthetics may validly be considered in zoning regulations, it certainly is not enough to sanction exclusion of a particular kind of use on the sole ground that its appearance offends the subjective sensibilities of the local governing body. Objective standards in this field are hard enough to fashion and work with, for even expert tastes vary so greatly. *Bassett, Zoning* 97–98 (1940). Letting a use be controlled by individual preferences and prejudice, devoid of standards entirely, is the antithesis of proper judicial review. The majority's view could as well support exclusion of modernistic dwelling architecture, split level homes, or even whole developments of identical houses if a bare majority of the township committee does not like their looks.

Nor is a use validly prohibited because it might later develop that the zone for it was improvidently chosen necessitating a change in classification, resulting in a nonconforming use. If this were to be a sound criterion, we could never have any planning or zoning of virgin areas, for the best theoretical views of planners may often not work out in practice and amendment is frequently found necessary.

I have no doubt that, if the issue in this case is approached in the way I have indicated it should be, the particular circumstances in Gloucester Township shown by

gestion seems sound that they should be located in districts akin to multi-family residential zones away from busy highways, but with particular requirements of ground area, arrangement, buffers and the like to immunize any adverse impact on other uses in the vicinity. *Bartley and Bair, Mobile Home Parks and Comprehensive Community Planning* 77–79 (1960). The special exception technique, *N. J. S. A.* 40:55–39(b), would appear to be an especially appropriate method of handling both specific location and desirable physical regulations of each individual case.

the record are such that prohibition of mobile home parks throughout the municipality should be held unlawful. It is clearly a heterogeneous, growing municipality, very close by the Philadelphia metropolitan area, in the path of further expansion of varied kinds. The northern half of its 23 square miles is already quite densely settled, mostly with small home development and neighborhood business areas along and adjacent to old and new highways. The southern half is very largely undeveloped, with no established character as yet. Most of the vacant land throughout the township is zoned for industrial use, although there is none now. This classification seems more a device to block further home construction on any large scale (as witness the provision permitting dwellings therein only with approval of the Board of Adjustment) than evidence of any real hope of filling with industry the areas so zoned. Planning and zoning to date have been pretty much catch-as-catch-can and piecemeal. But practically all conceivable uses except nuisance industries and mobile home parks are permitted. There is plenty of room in the vast undeveloped areas for all manner of classification districts, which, by appropriate regulations, can compatibly exist without deleterious impact on each other and at the same time lead to the creation of a balanced and attractive community. There is nothing to indicate that a mobile home park is not a legally and factually appropriate use somewhere in such a scene. To hold that it is not exceeds the bounds of reason.

I would affirm the judgment of the Appellate Division. Justice SCHETTINO joins in this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR and HANEMAN—5.

*For affirmance*—Justices HALL and SCHETTINO—2.