FOBE ASSOCIATES, A PARTNERSHIP, PLAINTIFF-APPELLANT, v. THE MAYOR AND COUNCIL AND THE BOARD OF ADJUSTMENT OF THE BOROUGH OF DEMAREST, DEFENDANTS-RESPONDENTS.

Argued May 25, 1976—Decided March 23, 1977.

520 

*Mr. Elliot W. Urdang* argued the cause for appellant (*Messrs. Dorfman & Urdang,* attorneys).

*Mr. Marvin Olick* argued the cause for respondents (*Messrs. Gruen, Sorkow & Sorkow,* attorneys).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. Plaintiff, a developer, was unsuccessful in the Law Division in seeking adjudications that (a) the denial by the Demarest Borough board of adjustment of a recommendation of a "d." variance (*N. J. S. A.* 40:55–39 d.) for erection of a garden apartment house in a restricted single-family residence district was illegal as arbitrary and unreasonable; and (b) that the zoning ordinance of the borough was invalid by reason of its absolute prohibition of multi-family-residential buildings. The Appellate Division affirmed the trial court judgment for defendants. We granted certification, 69 *N. J.* 74 (1975), and heard argument in this case and in *Pascack Association v. Mayor and Council of Washington,* 74 *N. J.* 470 (decided this day) together, similar questions being implicated. We affirm.

The Borough of Demarest is situated in northeast Bergen County in an area known as the Northern Valley. It is located within a few miles from, and is within easy commutation distance of, New York City and principal cities of northern New Jersey. It comprises approximately 1,345 acres. The borough's first zoning ordinance was adopted in 1941 and contained no provision for multi-family housing. With only a few minor changes it remained intact until 1966 when a new master plan and the present zoning ordinance were enacted, substantially upgrading minimum lot requirements.

Under the present ordinance, there are five single-family residential zones in the town with minimum lot sizes ranging from 10,000 square feet to 40,000 square feet. These residential zones account for 1,338 acres; the remaining

seven acres are zoned as one single commercial district. This "business district" is of the neighborhood variety, consisting of a row of stores and a bank.

It is not disputed that Demarest can be characterized as a developed or almost completely developed municipality. Of the total 1,345 acres in the borough, 35.5 acres are privately owned vacant residential land, 34.0 more privately held acres are underdeveloped and may be subdivided, and 228.5 acres are taken up by a privately owned school and an operating golf course. Hence, excluding the school and golf course areas as unavailable, Demarest is 97.5% developed. The area developed with single-family homes consists of about 1400 lots, about 550 being lots of from a quarter to a half acre and the remainder from a half acre to an acre.

Plaintiff's property is a vacant parcel of approximately 8.15 acres situated between County Road and Piermont Road, both county roads. It is located in a BB residential zone requiring single-family development on minimum 30,000 square foot lots. It is a heavily wooded tract of relatively uniform topography, and municipal and public utilities are available. Plaintiff proposes to build a 120 unit garden apartment development. It would consist of five separate buildings, colonial styled of brick veneer, one building each facing County and Piermont Roads, the other three facing the interior of the property. Setbacks would vary from 50 to 120 feet. The net building coverage (deducting land to be dedicated) would be 16.5%. The proposed project would consist of 80 one-bedroom and 40 two-bedroom units, allegedly in the middle to moderate income range. Parking would be available for 185 automobiles.

I

*The Validity of the Zoning Ordinance*

At the trial in the Law Division it was agreed that the record before the board of adjustment on the variance ap-

plication would be stipulated as relevant to the issue of validity of the ordinance as well. However, in view of our conclusions on matters of law in our opinion in the companion *Pascack Association* case, *supra,* it will not be necessary fully to analyze either the testimony before the board of adjustment or that newly adduced before the Law Division for purposes of the present point.

There is no essential difference between the facts here and those in *Pascack Association* in respect of the contention of invalidity advanced in both cases. That position was that in view of the essentiality of housing for all categories of people and families and the current shortage of multi-family housing in and around the environs and regions of Washington and Demarest, respectively, it is mandatory that every municipality in those regions, regardless of the nature and extent of its current development, provide by its zoning ordinance the opportunity for some degree of multi-family residential development. We rejected that contention in *Pascack Association.* We held that the reasonableness of exclusion by zoning of multi-family housing depended upon the nature and extent of development in the municipality. There, where the historical development of a small municipality over a period of time was one almost of total devotion to the provision of a homogeneous single-family residence community to satisfy the needs and desires of people most of whose household heads had occupations elsewhere, we concluded that there was nothing invidious in a zoning or general welfare sense about such development. We further held that it was not mandatory that any part of the small amount of vacant land left in the municipality be zoned for multi-family housing as against the municipal legislative judgment that the best interests of the municipality would be served by preserving its character and stabilizing its development as a single-family residential community.

We took notice of our intervening decision in *So. Burl. Cty. N. A. A. C. P. v. Tp. of Mt. Laurel,* 67 *N. J.*151, app.

dism. and *cert.* den., 423 *U. S.* 803, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975) (*"Mount Laurel"*, hereinafter), see also *Oakwood at Madison, Inc. el al. v. The Township of Madison,* 72 *N. J.* 481 (1976), and held that case not authority for a different result. We pointed out that the gravamen of *Mount Laurel* was the fundamental illegality of zoning in a developing municipality, with sizable available areas of developable land, which denied to low and moderate income families the opportunity of obtaining new housing there. Washington Township was not of the character so delineated.

We acknowledged in *Pascack Association* the serious current shortage of housing in Bergen County and elsewhere in the state and recommended legislative attention to the problem, possibly by creation of regional or state zoning agencies, functioning under corrective standards. But a sociological crisis not meeting the peculiar dimensions of the exigency which compelled our attention in *Mount Laurel* was not regarded as the appropriate occasion for imposing upon the judiciary "the role of an *ad hoc* super zoning legislature \* \* \*" for every municipality in the State. *Pascack Association v. Mayor and Council of Washington, supra,* 74 *N. J.* pp. 487–488.

As noted above, we perceive no significant difference between the factual situations in Washington Township and Demarest Borough in relation to the application of the foregoing principles. Demarest is less than 2½ square miles in area, with a 1970 population of 5,133 (as revised from an original incorrect census figure of 6,282). As cogently pointed out by a planning expert who testified for the township, virtually all of Demarest's housing has been built in response to regional needs and demands for precisely the kind of housing which eventuated. There is no industry and little commerce in Demarest. Thus local activities of the latter kinds have generated no correlative need for local housing, *cf. Mount Laurel,* 67 *N. J.* at 187, and an important and necessary regional purpose has been served

in providing suitable housing in a desired environment for those whose industrial, commercial and professional activities elsewhere have benefitted the social order. How best to use the few isolated parcels of vacant land remaining in Demarest is a matter for the local governmental bodies unless and until the Legislature expressly ordains any specific disposition (within constitutional limitations). The Demarest ordinance is not invalid on the grounds advanced by plaintiff.

## II

### Application for the Variance

A considerably more complex question is presented by the denial of a recommendation for a variance for plaintiff's project.[1] It comprehends several sub-issues: (a) Is the alleged regional need for multi-family housing a proper "special reason" for granting a d. variance (*N. J. S. A.* 40: 55–39 d.) in a single-family district on "general welfare" grounds? (b) If it is, is it a use "inherently" serving the general welfare, so as not to require a showing that the public welfare benefit is peculiarly dependent upon the location of the site of the variance, see *Kohl v. Mayor and Council of Fair Lawn*, 50 *N. J.* 268, 279–280 (1967)? (c) If it is not such an "inherently" beneficial use, is there the required showing specified in (b) *supra*? (d) In any case, is a denial of variance by the board of adjustment on the grounds which it advanced so arbitrary, capricious or unreasonable as to require the court to mandate a recommendation for variance?

---

[1]Under the statute, the board can only recommend a d. variance. The governing body is required to accept or reject the recommendation. *N. J. S. A.* 40:55–39 d.

The Municipal Land Use Law (*L.* 1975, *v.* 291), which became effective subsequent to the municipal actions herein, permits the board to grant a d. variance by a two-thirds vote of its entire membership, *N. J. S. A.* 40:55D–70 d. Such action may be appealed to the governing body, *N. J. S. A.* 40:55D–8 a.

█ A more extended survey of the proofs before the board of adjustment, to which a reviewing court is confined in resolution of the issues, see *Reinauer Realty Corp. v. Paramus,* 34 'N. J. 406, 416–417 (1961), is necessary at this point.

The property in question has access to two parallel roads, Piermont Road on the east and County Road on the west. Surrounding property to north, east and west is zoned, like the subject tract, for minimum 30,000 square foot lots. Land to the south is zoned for minimum 22,500 square foot lots, also single-family. Surrounding the tract are a number of single-family homes, considerable vacant land, some owned by the town, and two old houses the nature of whose use was disputed. Plaintiff's expert thought they contained, respectively, three and five families. The zoning officer disputed this as to one of the houses.

A professional planner named Moore testified for plaintiff that there was a need for multi-family rental housing in Demarest and the region as a whole. There are only 39 housing units in two-family houses (2.1%) and 28 units in apartment houses (1.6%) in Demarest. The neighboring boroughs of Alpine, Closter, Cresskill and Haworth were described as of similar characteristics. Ninety-four per cent of all residential units in eleven homogeneous municipalities in the northeast quadrant of Bergen County were single-family; of all the land therein 88% was zoned for single family, 2% for two-family and none for multi-family. However, using what the Bergen County Planning Board denominates as the Northern Valley sector (15 towns inclusive of Demarest) 76% of the housing units are one-family and 24% multi-family. The latter figure compares with 41% in the State, 38% in Bergen County and 3.7% in Demarest. Citing figures compiled by the Bergen County Planning Board, Moore said there was an annual need for 5,113 new housing units in the county, yet only 2,344 permits were issued in 1969 and 1,732 in 1970.

Moore was of the view that every municipality should have some land zoned multi-family residential and that Demarest should have from 10% to 25% of residential units of that character. There is a particular area need for rental apartments for the elderly, single persons and young marrieds. The instant project would attract those kinds of tenants. Moore was of the view that the tract was physically well suited for the proposed project; that its location on two travel arteries, as well as near stores and a proposed recreational complex, made it excellent for multi-family use; that it would be visually shielded from nearby residences; and that public utilities would be available. He did not believe the project would impair the zone scheme and plan because the plan itself was deficient in failing to provide for multi-family housing.

Plaintiff produced a real estate expert, Stewart, who estimated that the one-bedroom apartment in plaintiff's project would rent for $275 monthly and the two-bedroom for $325, requiring incomes of $14,000 and $16,900 respectively. He corroborated Moore as to shortage of apartments in eastern Bergen County. Stewart said the erection of the project would not lower the value of surrounding property for single-family development by more than 3% or 4%.

An objecting neighbor offered a witness, Berliner, an architect with some planning experience, who gave the opinion that the subject property was unsuitable for garden apartments. He concluded it failed to meet several planning principles: (1) that the project have roughly the same density as the surrounding area; (2) that it have the same activity level; (3) that it create the least offense to surrounding neighbors; and (4) that a suitable buffer zone be created. Berliner disputed Moore's view that good planning called for every municipality to have a percentage of land zoned for multi-family housing and cited the Regional Plan Association's suggestion that there should be regional diversity, with some municipalities maintaining unique characteristics, rather than every municipality pro-

viding various kinds or densities of housing. If there is a need in Demarest itself for multi-family housing, its location should be based on a careful, exhaustive study rather than be determined by variances on an *ad hoc* basis. The instant application would be spot zoning.

Berliner felt the project would have major adverse impact on the immediately surrounding area, with a gradually lesser effect on more distant sectors. It would have a major negative effect on the master plan of the borough. However, somewhat ambivalently, Berliner would not say that this single project would alter the established character of Demarest as a whole.

A neighboring resident, one Press, testified he had investigated rental apartments in the area and their cost. One-bedroom apartments in nearby Tenafly rent for from $295 to $375 per month. Two-bedroom apartments in Oradell rented for $500 per month. On a comparable square foot rental basis the proposed Demarest apartments would rent for $350 (one bedroom) and $393 (two bedroom). Since the Demarest site was more attractive than the others, a $50 premium factor could be added. Press examined records indicating that 37% of the homes sold in Demarest in 1972 were sold for $45,000 or less. He estimated that carrying charges on a $40,000 home in Demarest, after a $7,000 downpayment, not including heat, repairs and maintenance, would be approximately $350 per month. He thus concluded that it could be less expensive for some families to carry a single family house than live in such a two-bedroom apartment as projected by plaintiff.

The attorney for the Demarest Planning Board was permitted, over vigorous objection by plaintiff, to offer in evidence a resolution of that body opposing the variance application. The planning board felt the variance would be substantially detrimental to the public good and to the intent and purpose of the master plan and ordinance. It would interfere with the planned population of the borough and thwart orderly growth; it would violate the neighborhood

scheme to the detriment of nearby home owners who had relied on the ordinance and master plan; it would effectively make it impossible to prevent multi-family developments on other vacant lots in the borough.[2]

In denying a recommendation for the requested variance the board of adjustment made findings of fact, *inter alia,* (1) that multi-family dwelling units would be found in nearby municipalities which "supply the needs of the general area and the borough of Demarest"; and (2) that the borough "is essentially a low-density, single-family home community which is virtually totally developed with a relatively small amount of privately owned land available for development; the Borough has little commercial use and has sufficient housing for persons working within the Borough". The board's conclusions were:

(a) That the Borough of Demarest is a community of established character that is almost totally developed with one family residential structures and the granting of the variance sought by the Appellant would have a major impact upon the entire Borough generally and even a greater impact upon the surrounding neighborhood.

(b) The special reasons advanced by the Appellant to the effect that the municipality has an obligation to furnish a balance in housing for its citizens, has not been proven to the satisfaction of the Board and is based solely on the naked, unsupported testimony of Appellant's Planner. Further, the alleged needs of those who cannot afford one family dwellings, or those who do not desire same, will not necessarily be met by the proposed development.

(c) That the Borough of Demarest, acting through its Planning Board and Governing Body, adopted a master plan and implemented it with a Zoning Ordinance approximately thirteen years ago. The Zoning Ordinance of the Borough has, from time to time, been amended as the need arose. There is no reason to believe that if the need truly exists for multi-family dwellings within the Borough, that the responsible bodies would not recommend and adopt the appropriate legislation, based upon a thorough evaluation and a complete inventory of needs and available land.

(d) That the granting of the variance would substantially impair the intent and purpose of the zone plan and Zoning Ordinance of the Borough of Demarest and would operate as a substantial detriment to the public good.

---

[2]We consider the admissibility of the resolution in IIB. hereof.

Of the findings of fact mentioned above, the one that needs of "the general area" for multi-family dwelling units are supplied by nearby municipalities is not supported by substantial evidence if the "general area" is taken as a reasonably large housing market region inclusive of Demarest. Indeed, the evidence is to the contrary. But there is substantial support for the determinations that Demarest *per se* does not need such housing based on the generation of its business or industry and there was no substantial evidence that its present residents need and cannot obtain such accommodations.

■ Of the conclusions of the board set forth above, (c) is irrelevant. The variance grant serves a zoning function distinct from that of amendment of the ordinance, and the mere failure of the governing body to amend to provide for multi-family dwellings is not necessarily a good reason for denial of a variance. We find the other conclusions of the board supported by substantial evidence.

The Law Division judge was of the view that there were special reasons which would properly have grounded the grant of a d. variance but that the discretionary determination of the board *contra* should not be set aside. The Appellate Division concluded there were no special reasons which would have justified a variance and that no board of adjustment could with propriety conclude that the variance would not substantially impair the intent and purpose of the zone plan and ordinance. It was thought that if the zone plan was outmoded rectification should properly be by amendment or revision of the ordinance, not by variance, citing *Kramer v. Bd. of Adjust., Sea Girt,* 45 *N. J.* 268, 290 (1965).

### A. "Special Reasons"

We first confront the question whether a regional need for and shortage of multi-family rental housing is a "special reason" for a recommendation of a use therefor con-

trary to a restriction of the district to single-family residences on minimum 30,000 square foot lots.[3] Plaintiff urges that construction of apartment houses anywhere in the Demarest region serves the general welfare and thus legitimizes a variance therefor under the rationale expressed in one of our recent decisions as follows:

The pertinent section of the zoning enabling act, *N. J. S. A.* 40: 55-39(d) authorizes the grant of a use variance upon an affirmative finding of "special reasons" "in particular cases", together with the negative findings, applicable in all zoning relief situations, that the "relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."

It is long settled law in this state that this unique provision does not require that the particular premises cannot feasibly be used for a permitted use or that other hardship exists. "Special reasons" is a flexible concept; broadly speaking, it may be defined by the purposes of zoning set forth in *N. J. S. A.* 40:55-32, which specifically include promotion of "health, morals or the general welfare." *Ward v. Scott,* 11 *N. J.* 117 (1952). So variances have been approved for many public and semi-public uses because they significantly further the general welfare. See, *e g., Andrews v. Board of Adjustment of the Township of Ocean,* 30 *N. J.* 245 (1959) (parochial school in residential zone); *Black v. Montclair,* 34 *N. J.* 105 (1961) (additional parochial school building in residential zone); *Burton v. Montclair,* 40 *N. J.* 1 (1963) (private school in residential zones); *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N. J. Super.* 509 (App. Div. 1963), *cert.* den. 41 *N. J.* 116 (1963) (telephone equipment building in residential zone); *Kunzler v. Hoffman,* 48 *N. J.* 277 (1966) (private hospital for emotionally disturbed in residential zone). Compare *Kohl v. Mayor and Council of Borough of Fair Lawn,* 50 *N. J.* 268 (1967); *Mahler v. Board of Adjustment of Borough of Fair Lawn,* 94 *N. J. Super.* 173 (App. Div. 1967), aff'd o. b. 55 *N. J.* 1 (1969). [*DeSimone v. Greater Englewood Housing Corp. No.* 1, 56 *N. J.* 428, 440 (1970) (upholding a variance for a semi-public low income housing project outside a ghetto area.)]

However, an important qualification of this principle had been laid down by the court in *Kohl v. Mayor and Coun-*

---

[3]There was no proof and there is no argument that this tract is not developable for residences on such lots or that the lot size is unreasonable.

*cil of Borough of Fair Lawn, supra* (50 *N. J.* 268). This was that since almost all legal uses of property serve the "general welfare" in some degree, the mere showing that the use for which a d. variance was sought would serve the general welfare (in that case, the enlargement of a non-conforming milk processing plant in a residential district) would not suffice as an affirmative "special reasons" basis for a variance. Only if the use was one which "inherently" served the general welfare,[4] such as a school or a hospital, would the use *per se* constitute a proper special reason for a variance. 50 *N. J.* at 279. If not of that consequence, there would have to be a showing and finding "that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." *Ibid.*

In support of his determination for the court in *Kohl,* and reflecting light on its true meaning, Justice Proctor cited *Mocco v. Job,* 56 *N. J. Super.* 468, 477 (App. Div. 1959) and Cunningham, "Control of Land Use in New Jersey by Means of Zoning", 14 *Rutgers L. Rev.* 37, 93, n. 261 (1959), the latter commenting favorably on Judge Price's holding in *Mocco v. Job, supra,* that for a valid d. variance it must be shown and found that "the particular site * * * *must* be the location for the variance" sought in order to promote the general welfare. (emphasis added). Thus, in *Kohl,* the court said that there was "no showing that the promotion of the general welfare could be accomplished only by an expansion of [the milk processing plant] at its present location." 50 *N. J.* at 280.

In the present case there was neither proof nor findings that unless the plaintiff's project is erected at the par-

---

[4] The issue was anticipated in *Mahler v. Borough of Fair Lawn,* 94 *N. J. Super.* 173, 184 (App. Div. 1967) aff'd o. b. 55 *N. J.* 1 (1969), where the court drew a distinction between "uses of an institutional dimension", and others, which, while serving the general welfare in a general sense, were not as vital to the public interest as the former.

ticular site for which the variance is sought the general welfare inherent in provision of more multi-family housing will not be attained. Thus, applying the *Kohl-Mocco* rationale, the inquiry turns to whether provision of small middle-income apartment units in Demarest is "inherently" in service of the general welfare so as to warrant a d. variance *ipso facto* without regard to location of the use.

The question is a difficult one to resolve.

We begin with the enjoinder, repeated as recently as *Kohl*, that "[v]ariances to allow new nonconforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning." 50 *N. J.* at 275. In *Andrews v. Ocean Twp. Board of Adjustment*, 30 *N. J.* 245, 253 (1959), the case originating the doctrine that a special reasons variance could be grounded in the general welfare without more, and without showing hardship to the applicant, Justice Hall, dissenting, expressed fear of a resulting "almost untrammeled discretion in the local administrative agencies to grant a use variance under so-called standards so broad that almost every variance allowed will have to be sustained." *Id.* at 257. It was his view that if a use "of a public or semi-public nature" is wanted by a community and it is thought it should be allowed at a location appropriate to the nature of the use, this should not be effected by variance but by special exception.[5]

---

[5]The breadth and amorphousness of our "special reasons" d. variance under the *Andrews* doctrine has drawn authoritative criticism. See 5 Williams, American Land Planning Law (1975), § 149.18–149.19, pp. 84–188; Cunningham, "Control of Land Use in New Jersey by Means of Zoning", 14 *Rutgers L. Rev.* 37, 93–94 (1959).

The New Jersey County and Municipal Government Study Commission has commented adversely on the use of the variance procedure for construction of multi-family units in suburban areas. In a study of such variances from 1965–1972 the Ninth Report of the Municipal Commission noted that "the use of variances in this way obviates the goal of preplanning the appropriate use[s] for each district. Furthermore, by its nature it makes impossible the intelligent anticipation of development needed to plan for service provision and a balanced com-

Justice Hall gave renewed expression to the foregoing views in a context relevant to the instant case when he stated, in the course of his opinion for the court in *Mount Laurel,* that "(* * * considerable numbers of privately built apartments have been constructed in recent years in municipalities throughout the state, not allowed by ordinance, by the use variance procedure. *N. J. S. A.* 40:35–39d. * * *)." 67 *N. J.* at 181, n. 12. He went on to say: "While the special exception method, *N. J. S. A.* 40:55–39b., is frequently appropriate for the handling of such uses, *it would indeed be the rare case* where proper 'special reasons' could be found to validly support a subsection (d) variance for such privately built housing * * *". (emphasis added). *Id.* at 181–182. The animadversion to "privately built housing" in the foregoing excerpt may have been intended by way of contrast to the *quasi*-public housing project involved in *DeSimone v. Greater Englewood Housing Corp. No. 1, supra,* and held by Justice Hall there to warrant a d. variance in a single-family residential district.

Moreover, the fact that the monition as to d. variances for apartment houses in single-family districts is incorpo-

munity." *Housing & Suburbs: Fiscal and Social Impact of Multifamily Development, Ninth Report* 113 (1974).

The decision in *Brunetti v. Mayor, Coun. Tp. of Madison,* 130 *N. J. Super.* 164 (Law Div. 1974), upholding a variance for construction of garden apartments on the grounds that such housing constitutes a special reason within the scope of *N. J. S. A.* 40:55–39 d. has been criticized as "subverting rational land use planning" so as to "inevitably result in even greater misplanning in New Jersey suburbs." Mallach, "Do Lawsuits Build Housing?: The Implications of Exclusionary Zoning Litigation", 6 *Rutgers-Camden L. J.* 653, 658, 676 (1975). Granting such variances "largely on the basis of the absence of negative findings, would result in arbitrary changes in the use of land, precluding serious planning for services, facilities, traffic circulation and other community needs." *Id.* at 659. To the same effect, Mytelka, "The *Mount Laurel* Case: Where to Now?", 98 *N. J. L. J.* 513, 522 (1975). See also Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 *Seton Hall L. Rev.* 1, 11 (1975), rejecting the special use exception for low and moderate income housing as a remedy for exclusionary zoning because of its potential for abuse.

rated into the *Mount Laurel* opinion would appear to undermine to some degree the heavy reliance upon the general philosophy of *Mount Laurel* by plaintiff in asserting the thesis that multi-family housing is so inherently for the general welfare as to qualify as an affirmative special reason for a d. variance.[6]

Withal, however, after having said what is set forth above, óne is hard put to respond to the insistence that if "adequate housing of all categories of people is * * * an absolute essential in promotion of the general welfare required in all local land use regulation", as stated in *Mount Laurel,* 67 *N. J.* at 179 (whether or not the statement constituted a strict holding, as to which see our opinion in *Pascack Association v. Mayor and Council of Washington, supra,* 74 *N. J.* pp. 483–484, 485–486), a variance to provide additional rental housing in a region which plainly needs it is "inherently" for the general welfare, in the *Kohl* sense of the concept.

We propose to leave definitive resolution of this knotty problem to a future case which will compel it; the instant one does not. For reasons which follow, we conclude that even if the provision of multi-family housing in Demarest is inherently for the general welfare, so as to affirmatively authorize a d. variance *if the negative criteria of N. J. S. A.* 40:55–39 *were met,*[7] the decision of the board of adjust-

---

[6]The Appellate Division, in addition to the case *sub judice,* reversed the grant of a d. variance for an apartment house in a single-family district in *Jenpet Realty Co., Inc. v. Ardlin, Inc.,* 112 *N. J. Super.* 79 (App. Div. 1970), certif. den. 57 *N. J.* 436 (1971), and affirmed a denial in *Segal Const. Co. v. Zoning Bd. of Adj. Wenonah,* 134 *N. J. Super.* 421 (App. Div.), certif. den. 68 *N. J.* 496 (1975), and *Nigito v. Borough of Closter,* 142 *N. J. Super.* 1 (App. Div. 1976). Denial of a variance for senior citizen housing was upheld in *Leon N. Weiner & Asociates Inc. v. Housing Authority of Borough of Glassboro,* 144 *N. J. Super.* 509 (App. Div. 1976).

[7]These negative criteria are that the variance will be "without substantial detriment to the public good and will not substantially

ment to deny the variance should be upheld. That determination was based on a finding that the grant would substantially impair the intent and purpose of the zone plan and zoning ordinance, and also, impliedly, that the zoning benefits would not outweigh the zoning harms consequent upon a variance. We cannot find these determinations to be arbitrary or without substantial support by evidence in the record.

As was stated in *Mahler v. Borough of Fair Lawn, supra* (94 *N. J. Super.* at 185–186), an Appellate Division opinion we adopted in affirming in that case (55 *N. J.* 1):

> Our cases recognize that there is an area of special discretion reposed in the local agencies within which, in many situations, either the grant or denial of a (d) variance would be judicially sustained. The board of adjustment weighs the facts and the zoning considerations, *pro* and *con*, and will be sustained if its decision comports with the statutory criteria and is founded in adequate evidence. See *Rain or Shine Box Lunch Co. v. Newark Board of Adjustment,* 53 *N. J. Super.* 252, 259 (App. Div. 1958); *Yahnel v. Board of Adjustment, Jamesburg, supra,* 79 *N. J. Super.,* at p. 519.

It is apparent that in many, if not most, cases the decision of a board of adjustment on a contested d. variance application is an amalgam of resolution of fact and exercise of discretion. It was put this way in *Yahnel v. Bd. of Adjust. of Jamesburg, supra* (79 *N. J. Super.* at 519):

> \* \* \* the statutory rationale of the function of the board of adjustment is that its determinations that there are special reasons for a grant of variance and no substantial detriment to the public good or impairment of the zone plan, etc., in such grant represent a discretionary weighing function by the board wherein the zoning benefits from the variance are balanced against the zoning harms. If on adequate proofs the board without arbitrariness concludes that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands.

impair the intent and purpose of the zone plan and zoning ordinance." *N. J. S. A.* 40:55–39.

. A similar expression in the context of the review of a denial of a variance is found in *Rain or Shine Box Lunch Co. v. Newark Bd. of Adjust.*, 53 *N. J. Super.* 252, 259 (App. Div. 1958). Accord: *Shell Oil Co. v. Zoning Bd. Adj. Shrewsbury*, 64 *N. J.* 334 (1974), reversing on dissent in 127 *N. J. Super.* 60, 62 (App. Div. 1974).

Having in mind that in the administration of the law on this subject there is always a particular concern over the judicial overruling of a denial of a variance, as distinguished from a grant, for the reasons expressed in the *Kohl* case, *supra,* and quoted above, and see *Cummins v. Bd. of Adjustment of Bor. of Leonia*, 39 *N. J. Super.* 452, 460, 461 (App. Div.), certif. den. 21 *N. J.* 550 (1956), the foregoing principles dictate an affirmance of the concordant determinations of the Law and Appellate Divisions not to disturb the denial of a recommendation for a variance by the board of adjustment. We have already found that the conclusion that the grant would substantially affect the zone scheme and plan adversely is supported by substantial evidence. We add that the implied, discretionary determination that whatever zoning benefits might accrue from the variance sought are outweighed by the zoning harm envisaged by the board cannot, on this record, be adjudged arbitrary or capricious.

### B. The Admission of the Resolution of the Planning Board

Plaintiff has assailed the acceptance in evidence by the board of adjustment of the disapproving resolution submitted by the planning board as an unwarranted interference by the latter with the independence of the board of adjustment. We regard this characterization as unfounded. The board of adjustment was not obligated to give the recommendation of the planning board any more weight than it rationally warranted — and there is nothing before us to indicate that it did.

The statutory place occupied by planning boards in New Jersey planning and zoning law[8] would seem to give them a status fully justifying respectful attention to their views by a board of adjustment passing on an application for a variance — particularly a d. use variance. Planning boards are generally empowered to prepare, adopt and amend a master plan for the physical development of the municipality, *N. J. S. A.* 40:55–1.10, and recommend boundaries or regulations for inclusion in the zoning ordinance, *N. J. S. A.* 40:55–33. Recommendations of the planning board must be solicited prior to approval of subdivisions or plats, *N. J. S. A.* 40:55–1.14; adoption or amendment of an official map, *N. J. S. A.* 40:55–1.35, *N. J. S. A.* 40:55–1.37; adoption of a zoning ordinance, *N. J. S. A.* 40:55–33; or amendment and modification thereof. *N. J. S. A.* 40:55–35.

Under certain circumstances, certain matters within the cognizance of the board of adjustment may be referred to the planning board for review. *N. J. S. A.* 40:55–1.13 provides in pertinent part:

The governing body may by ordinance provide for the reference of any other matter or class of matters to the planning board before final action thereon by any municipal public body or municipal officer having final authority thereon, with or without the provision that final action thereon shall not be taken until the planning board has submitted its report, or until a specified period of time has elapsed without such report having been made.

In *Kozesnik v. Montgomery Twp.,* 24 *N. J.* 154 (1957) the Supreme Court upheld the validity of an ordinance delegating permit applications for quarry excavations to the planning board. Apparently contending that the quarry permit was in the nature of a special exception, plaintiffs ar-

[8]The Municipal Land Use Law (*L.* 1975, *c.* 291) contains substantial revisions of previous provisions concerning powers, duties and functions of planning boards. Since the new law became effective subsequent to the proceedings below, we have not considered it in relation to this controversy.

gued that the approval of the permit was solely within the province of the board of adjustment. Rejecting this argument, the court not only found the referral to be statutorily authorized, *N. J. S. A.* 40:55–1.13, but also that the planning board was the "singularly appropriate agency since the matters thus referred are cognate to the purposes of municipal planning, *N. J. S. A.* 40:55–1.12." 24 *N. J.* at 178–179. But see *Saddle River Country Day School v. Saddle River,* 51 *N. J. Super.* 589, 603 (App. Div. 1958), aff'd o. b. 29 *N. J.* 48 (1959).

The question of the impact of a proposed project on its surroundings and on the municipal plan and zoning ordinance seems clearly to be within the broad and general subject of planning and hence within the cognizance of a planning board. Indeed, when that question arises within the context of a requested zoning amendment, *N. J. S. A.* 40:55–35 specifically recognizes the expertise of the planning board. Arguably, when the question arises in the course of a variance proceeding, the expertise of the planning board is no less, yet the matter is committed to the jurisdiction of the board of adjustment, *N. J. S. A.* 40:55–39, absent an ordinance referring the same to the planning board. *N. J. S. A.* 40:55–1.13.

In the instant case, there is no such ordinance specifically pertaining to subsection (d) variances, although with respect to special uses the board of adjustment is instructed to inform all concerned official bodies of the applications for comment.[9]

■ Even absent an enabling ordinance permitting the planning board to submit its recommendations on a sub-

[9] Demarest Ordinance No. 319, § 4.4, provides that the board of adjustment shall inform such official bodies as may be concerned of the receipt of a special use application and each such official body, board or commission "may submit, prior to or at the public hearing, any facts, opinions, recommendations or other pleading on the subject matter as it may desire."

section (d) variance, it is plainly inferable that the last paragraph of the state enabling legislation, *N. J. S. A.* 40: 55–1.13, gives the planning board the power to so act:

> The planning board shall have full power and authority to make such investigations, maps and reports and recommendations in connection therewith relating to the planning and physical development of the municipality as it deems desirable.

Ostensibly, this provision gives the planning board the power to make such recommendations as the one at issue in the form of the contested· resolution.

This court recognized the appropriateness of a planning board expressing its non-binding opinion on the impact of a variance on the planning scheme in *Loechner v. Campoli,* 49 *N. J.* 504 (1967). Plaintiff, who owned several adjacent tracts of land, petitioned the board of adjustment for a variance to build on a substandard lot before applying to the planning board for subdivision approval. In holding that the plaintiff must first have obtained subdivision approval which the planning board could have granted subject to approval of the variance, the court stated (49 *N. J.* at 512):

> The planning board may, with its approval express its non-binding opinion as to whether the variance would be conducive to or detrimental to the planning scheme because of the undersize of a lot.

█ It is commonplace for boards of adjustment and courts to give consideration to reports of planning agencies such as master and regional planners as background material in zoning and planning cases. So long as reasonable notice of the submission of such materials is afforded an opponent, with an opportunity to meet any adverse impact therefrom, there can be no fair complaint concerning the use of such aids to informed adjudication. These observations are pertinent to the present subject. Plaintiff does not dispute the accuracy of any facts stated in the planning board resolution. It was aware of the resolution long before it was admitted

in evidence. It has not been deprived of a fair opportunity to respond to its substance. We find no error. *Cf. Metropolitan Bd. of Zon. App. v. Standard Life Ins. Co.*, 145 Ind. App. 363, 251 *N. E.* 2d 60 (Ct. App. Ind. 1969).

Judgment affirmed.

Justice SCHREIBER concurs in the judgment of the court.

SULLIVAN, J. (concurring). I concur in the majority opinion subject to my comments in the companion *Township of Washington case*, 74 *N. J.* 470 decided this same date.

### Outline of Dissenting Opinion

| I | Zoning for the General Welfare | 544 |
| II | The Statutory Framework | 547 |
| | A. "Special Reasons" | |
| | B. The "Negative Criteria" | |
| III | The (d) Variance as a Remedial Measure | 557 |
| IV | Conclusion | 561 |

PASHMAN, J., dissenting. Demarest is a community which clearly has failed to satisfy regional housing needs. It is composed of five single-family residential zones, with no provision for multi-family dwellings. As the majority recognizes, needs of the "general area" for multi-family dwelling units cannot be satisfied in nearby municipalities. *See ante* at 532. Yet, in spite of its exclusionary nature, the majority refuses to impose on Demarest the minimal obligation of utilizing any part of its remaining land to satisfy the general welfare. Because I believe that the majority misconstrues Demarest's constitutional and statutory duty to provide multi-family housing, I dissent.

As I noted in the companion case, *Pascack Ass'n, Limited v. Mayor and Council of the Tp. of Washington*, 74 *N. J.* 470 (1977) (Pashman, J., dissenting), any rigid distinction between "developed" and "developing" communities

thwarts an effective and equitable implementation of our holding in *So. Burlington Ct. NAACP v. Tp. of Mt. Laurel,* 67 *N. J.* 151 (1975), *cert.* den. and appeal dism'd, 423 *U. S.* 803, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975) (hereinafter *"Mt. Laurel"*). For the reasons stated in my dissenting opinion in the companion case, I would hold the Demarest zoning ordinance to be unconstitutional in that it fails to provide for the general welfare as defined in *Mt. Laurel.*

I further disagree with the majority's treatment of the procedures governing the issuance of a variance for special reasons, pursuant to *N. J. S. A.* 40:55–39(d). I do not underestimate the difficulties in developing manageable standards to govern the (d) variance procedure; however, I do not believe that the task justifies giving local officials complete discretion in this matter. Both statutory and constitutional considerations require careful review of the variance procedure to ensure that local officials define the general welfare to incorporate regional needs. I note that Mr. Justice Sullivan shares the view that the (d) variance procedure offers a unique opportunity to provide multi-family housing in communities which have enacted exclusionary zoning plans. *See ante* at 492–493 of 74 *N. J.* (Sullivan, J., concurring). He even notes that the meaningful utilization of said variance process may be the "solution" to the problem of exclusionary zoning. *Id.* To make the process virtually immune from effective review — as the majority does here — makes remedial efforts all the more difficult, and confuses careful land use planning with local obstructionism.

I

## *ZONING FOR THE GENERAL WELFARE*

The zoning powers of local communities are drawn from the power of the State to promote the public health, safety, morals or the general welfare. *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,* 71 *N. J.* 249, 263 (1976),

*Mt. Laurel,* 67 *N. J.* 151 at 174; *Rockhill v. Chesterfield Tp.,* 23 *N. J.* 117, 124–25 (1957).

Courts have traditionally been reluctant to limit the authority of zoning authorities because the concept of the "general welfare" which underlies the police power is not narrowly confined. *See Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* 71 *N. J.* at 264 ("general welfare" tends to encompass all other purposes stated in the zoning enabling legislation); *Schmidt v. Bd. of Adjustment, Newark,* 9 *N. J.* 405, 414 (1952) ("It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise."). In *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* we noted the expansive interpretation given this phrase by both this Court and the United States Supreme Court, and its adaptability to changing social conditions. *Id.,* 71 *N. J.* at 265, citing *Mt. Laurel, supra; Vickers v. Gloucester Tp. Comm.,* 37 *N. J.* 232, 268 (1962), *cert.* den. 371 *U. S.* 233, 83 *S. Ct.* 326, 9 *L. Ed.* 2d 495 (1963); *Pierro v. Baxendale,* 20 *N. J.* 17, 29 (1955); *Fischer v. Bedminster Tp.,* 11 *N. J.* 194, 205 (1952); 8 *McQuillin, Municipal Corporations,* § 25.20 at 60 (3 ed. 1965). We have repeatedly held that the decisions of governmental officials primarily entrusted with the planning power are presumptively valid and will be overturned only by an affirmative showing that they are arbitrary, capricious or unreasonable. *Bow & Arrow Manor v. Town of West Orange,* 63 *N. J.* 335 (1973); *Harvard Enterprises, Inc. v. Madison Tp. Bd. of Adjustment,* 56 *N. J.* 362, 368 (1970); *Vickers v. Gloucester Tp. Comm., supra* 37 *N. J.* at 242.

Nevertheless, judicial deference to municipal zoning power has limits and courts must take an active role in making certain that the planning power is not abused. Municipalities derive their planning powers from the State Legislature, *N. J. S. A.* 40 :55–30, and must exercise them in accordance with the planning purposes chosen by the Legislature. *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.,*

*supra,* 71 *N. J.* at 264; *J. D. Construction Corp. v. Freehold Tp. Bd. of Adjustment,* 119 *N. J. Super.* 140, 144 (Law Div. 1972). Accordingly, zoning must not be used as a device for excluding development. *Mt. Laurel,* 67 *N. J.* at 188 (". . . assuming some type of timed growth is permissible, it cannot be utilized as an exclusionary device or to stop all further development . . . ."); *National Land and Investment Co. v. Easttown Tp. Bd. of Adjustment,* 419 *Pa.* 504, 527–28, 215 *A.* 2d 597, 610 (1965) ("Zoning is a means by which a governmental body can plan for the future — it may not be used as a means to deny the future. * * * Zoning provisons may not be used * * * to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring."). The realization that excessive restriction of development would represent as great a threat to rational land use as would uncontrolled growth, together with our recognition of the importance of decent housing, led this Court in *Mt. Laurel* to require local zoning officials to affirmatively plan and provide for multifamily housing, 67 *N. J.* at 174, 175.

Justice Hall noted the Court's disfavor with communities which failed to provide for the changing needs of society when he stated:

[T]his Court has . . . plainly warned, even in cases decided some years ago sanctioning a broad measure of restrictive municipal decisions, of the inevitability of change in judicial approach and view as mandated by change in the world around us.

[67 *N. J.* at 176.]

Hence, our deference to the judgment of municipalities on zoning matters today is subject to the requirement that they consider regional needs, particularly the demand for low and middle income housing.

The majority's decision, however, creates a protected niche for "bedroom communities" by ascribing a regional purpose to their role in providing "a desired environment for those whose industrial, commercial and professional activities else-

where have benefitted the social order." *Ante* at 527. But a "desired environment" is not within the range of permissible zoning purposes if it entails exclusion of lower and moderate income persons. As we recognized in *Mt. Laurel,* single-family dwellings are virtually inaccessible to such groups. Nor do the supposed benefits to the social order deriving from the activities of a community's inhabitants give that municipality a privileged status. Their incomes, not their social contributions, permit them to live in such areas. I see no reason why they should be authorized to exclude others with lesser incomes in the name of the general welfare.

## II

### THE STATUTORY FRAMEWORK

A person seeking a variance must demonstrate that he has met both the "affirmative" and "negative" criteria for a variance under *N. J. S. A.* 40:55–39,(d). The applicant must prove "1) that 'special reasons' exist for the variance; and 2) that the variance 'can be granted without substantial detriment to public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'" *Kohl v. Mayor and Council of Fair Lawn,* 50 *N. J.* 268, 276 (1967). *See also, Kunzler v. Hoffman,* 48 *N. J.* 277, 284 (1966); *Wickatunk Village, Inc. v. Tp. of Marlboro,* 118 *N. J. Super.* 445 (Ch. Div. 1972). In the instant case, plaintiff's request for a variance meets both criteria.

### A. "Special Reasons"

The majority finds it unnecessary to determine whether satisfying regional housing needs may be a special reason for granting a (d) variance request. The opinion relies solely on the municipality's finding that the variance fails to satisfy the negative criteria under the statute. *Ante* at 537–538. However, I would hold that where an ordinance ex-

cludes a use which supplies multi-family housing in an exclusionary community, a court should shift the burden of proof on the issue of meeting the negative criteria; in such a case, local planning authorities would be required to show that special circumstances exist which would militate against granting the variance.

First, I agree with Mr. Justice Sullivan's statement that providing multi-family garden apartments in a region which is in critical need of such housing is a "special reason" for granting a variance. See *ante* at 493 of 74 *N. J.* (Sullivan, J., concurring). As the majority correctly notes, a use which inherently serves the general welfare *per se* constitutes a proper special reason for granting a (d) variance. *Ante* at 534. The majority, however, stresses the fact that the intended use in this case is not of an institutional or quasi-public nature. *Ante* at 533–534, 536–537. While uses which are institutional or quasi-public in nature often contribute to the general welfare, I see no reason for limiting (d) variances to such uses and excluding other development which would be of equal benefit to the general public.

Admittedly, several prior cases upholding (d) variances have involved institutional or quasi-public uses. However, those cases were primarily concerned with whether the use would benefit the public, and not with whether the public was sponsoring the proposed use; references to the nature of the use was meant only as a way of distinguishing variances which would *substantially* serve the public from those which would be of *some* benefit but which would not justify a departure from the established zone plan. *Compare Kohl v. Mayor and Council of Fair Lawn, supra,* 50 *N. J.* at 279 ("The cases in this Court in which a significant factor has been the contribution of the proposed use to the 'general welfare' all have involved uses which inherently served the public good.") *with id.,* 50 *N. J.* at 280 ("nearly all lawful uses of property promote, in greater or lesser degree, the general welfare. Thus, if the general social benefits of any individual use — without reference to

its particular location — were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance.").

Several cases reject the notion that a use must be of an institutional or quasi-public nature to meet the "special reasons" test. Significantly, in *Kramer v. Bd. of Adjustment, Sea Girt,* 45 *N. J.* 268 (1965), a unanimous Court held a (d) variance was a proper means of allowing landowners to replace an old nonconforming seaside resort hotel with an attractive, modern, fireproof one. And in *Brunetti v. Mayor and Council of the Tp. of Madison,* 130 *N. J. Super.* 164 (Law Div. 1974), the court directed the granting of a (d) variance for low and moderate income housing.

More recently, in *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* we commented upon the (d) variance procedure in stressing the social benefits of a particular use over its physical characteristics:

[A]ny rigid limitation of the zoning power keyed to the 'physical use' test (expressed some years ago in *Skaf v. Zoning Bd. of Adjustment of Asbury Park,* 35 *N. J. Super.* 215, 233 (App. Div. 1955), and approved in Justice Hall's dissenting opinion in *Andrews v. Ocean Tp. Bd. of Adjustment,* 30 *N. J.* 245, 256, 257 (1959)), must be regarded as implicitly rejected by the consistent line of authority begun by the *Andrews* case, *supra.* These cases hold that the beneficent social purposes of a use (apart from its physical nature) will justify 'special reasons' variances under *N. J. S. A.* 40:55–39(d). Specifically, see *DeSimone v. Greater Englewood Housing Corp. No. 1, supra,* 56 *N. J.* at 440, 442 (1970). Zoning for senior citizens' housing, for reasons amply set forth above, clearly involves special use qualities and characteristics . . . .

[71 *N. J.* at 278.]

Conspicuously absent from our discussion in that case was any requirement that the (d) variance be limited to institutional, public or quasi-public uses. Any attempt to distinguish multi-family housing which satisfies the needs of citizens generally from housing for specific groups such as the elderly, as in *Weymouth,* would contradict the broad definition of the welfare which I have already mentioned. *See*

*ante* at 543–545 (Pashman, J., dissenting). *See,* Note, "Need for Low-Income Housing Held to be a 'Special Reason' to Support a Use Variance Within the Meaning of *N. J. Rev. Stat.* § 40:55–39(d)." 2 *Rutgers-Camden L. J.* 400 (1970).

Of course, the Court should not require the granting of a (d) variance upon a showing that a given use would have only a slight benefit to the public. Such a result would have the undesirable effect of disrupting the planning efforts of local officials. *See generally, Kohl v. Mayor and Council of Fair Lawn, supra,* 50 *N. J.* at 280; *Mahler v. Borough of Fair Lawn,* 94 *N. J. Super.* 173, 184 (App. Div. 1967), aff'd o. b. 55 *N. J.* 1 (1969); *Andrews v. Ocean Tp. Bd. of Adjustment, supra,* 30 *N. J.* at 256 (Hall, J., dissenting). However, plaintiff's application for a variance to build a multi-family housing development would not yield merely *some* benefit to the general welfare, but would help alleviate a housing shortage which has reached critical proportions in Bergen County. *See Pascack Ass'n, Limited v. Mayor and Council of the Tp. of Washington,* 74 *N. J.* at 510–511 (Pashman, J., dissenting). Our decision in *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N. J.* 428 (1970), established that multi-family housing does have the type of significant impact on the general welfare which is necessary to qualify as a "special reason" for granting a (d) variance:

> We specifically hold, as matter of law in the light of public policy and the law of the land, that public or, as here, semi-public housing accommodations to provide safe, sanitary and decent housing, to relieve and replace substandard living conditions or to furnish housing for minority or underprivileged segments of the population outside of ghetto areas is a special reason adequate to meet that requirement of *N. J. S. A.* 40:55–39(d) and to ground a use variance.
> [56 *N. J.* at 442.]

*See also, Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* 71 *N. J.* 249 at 266 ("not only do housing needs fall within the purview of the 'general welfare,' but they

have been recognized as 'basic' by this Court"). To limit our holding in *De Simone* to public or quasi-public projects, or to replacement housing, would subvert the intended purpose of the (d) variance to further the general welfare.

The majority, however, finds that:

there is substantial support for the determinations that Demarest *per se* does not need such housing based on the generation of its business or industry and there was no substantial evidence that its present residents need and cannot obtain such accommodations.

[at 532.]

These findings alone are not determinative of the need for such housing. Zoning decisions are to be made with regard to regional considerations. *See Pascack Ass'n, Limited v. Mayor and Council of the Tp. of Washington*, 74 *N. J.* at 497–500 (Pashman, J., dissenting); *Oakwood at Madison, Inc. v. Tp. of Madison*, 72 *N. J.* 481 at 548 (1976); *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra*, 71 *N. J.* at 275 n. 9; *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough*, 47 *N. J.* 211, 288 (1966); *Borough of Cresskill v. Borough of Dumont*, 15 *N. J.* 238, 247–49 (1954); *Duffcon Concrete Products, Inc. v. Borough of Cresskill*, 1 *N. J.* 509, 513 (1949). This principle is equally applicable to decisions governing variance procedures. In *Kunzler v. Hoffman, supra*, the Court specifically noted that the decision whether or not to grant a (d) variance is to be made on the basis of regional needs:

General welfare, as that concept is used in the determination of whether special reasons exist under *N. J. S. A.* 40:55–39(d) for granting a use variance, comprehends the benefits not merely within municipal boundaries but also those to the regions of the State relevant to the public interest to be served.

[48 *N. J.* at 288.]

*Accord, Borough of Roselle Park v. Tp. of Union*, 113 *N. J. Super.* 87, 92–94 (Law Div. 1970). Thus, the majority's finding that housing needs of the region are not satisfied

in municipalities surrounding Demarest should serve to underscore the importance of granting the variance in this case. See *ante* at 532.

Plaintiff has established that his request for a variance satisfies the "affirmative criteria" under *N. J. S. A.* 40:55–39(d). Because multi-family housing has a substantial effect in furthering the general welfare, it *per se* constitutes a special reason for granting a (d) variance. *Ante* at 534.

Unless there are demonstrable reasons why the intended use would offend the negative criteria of the statute, the Court should require the municipality to grant the variance.

### B. The "Negative Criteria"

The "negative criteria" of *N. J. S. A.* 40:55–39(d), dictate that a variance be denied unless it is "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance."[1]

Although the majority makes constant reference to court decisions granting deference to local planning authorities, it never indicates what would constitute an arbitrary. un-

---

[1]Plaintiff argues that he has satisfactorily carried his burden in meeting the negative criteria, asserting that (1) his land is uniquely situated with access to two county roads which are capable of handling any traffic from the development; (2) because the location is near the center of town it is close to shopping in Demarest, Closter and the proposed Demarest recreation complex; (3) the use would not adversely affect property values: actual experiences of real estate sales, together with aesthetic considerations in planning the development support this conclusion (two of the Borough's nonconforming multi-family uses abut the property) ; and (4) the project would actually produce revenue, and would not put a strain on municipal or school services.

The new zoning statute, the "Municipal Land Use Law," *L.*, 1975 c. 291, effective August 1, 1976, also includes the (d) variance, *N. J. S. A.* 40:55D–70. The new zoning law embodies the emphasis on meeting regional needs which we first announced in *Mt. Laurel. See* companion case, 74 *N. J.* at 499–500, (Pashman, J., dissenting).

reasonable or capricious decision on the part of a municipality in denying a (d) variance.[2] Two of the conclusions reached by the local Board for denying the variance were found to be either irrelevant or contrary to the weight of the evidence by the majority (at 531–532). The remaining two "findings" seem to be little more than a recital of the statutory "negative" criteria:

(a) That the Borough of Demarest is a community of established character that is almost totally developed with one family residential structures and the granting of the variance sought by the Appellant would have a major impact upon the entire Borough generally and even a greater impact upon the surrounding neighborhood.

. . . . . . . . .

(d) That the granting of the variance woud substantially impair the intent and purpose of the zone plan and Zoning Ordinance of the Borough of Demarest and would operate as a substantial detriment to the public good.

[at 531.]

At least one of the reasons given by Demarest for denying the variance, which the majority found irrelevant, suggests the Board's failure to correctly apply the "negative" criteria to plaintiff's request. The Board found:

(c) That the Borough of Demarest, acting through its Planning Board and Governing Body, adopted a master plan and implemented it with a Zoning Ordinance approximately thirteen years ago. The Zoning Ordinance of the Borough has, from time to time, been amended as the need arose. There is no reason to believe that if the need truly exists for multi-family dwellings within the Borough, that the responsible bodies would not recommend and adopt the appropriate legislation, based upon a thorough evaluation and a complete inventory of needs and available land.

[at 531.]

---

[2] A court is not bound by the decision of a municipality to deny a variance. Justice Hall, in *DeSimone v. Greater Englewood Housing Corp. No. 1, supra*, reviewing a variance for low-income housing in that case, concluded that "a denial of it under the circumstances and proofs could not well be sustained." 56 *N. J.* at 443.

The above finding implies that the Board believed that multi-family housing could be accommodated only after "appropriate legislation." Rather than consider for itself whether there was a regional need for multi-family housing, the Board found that such a decision could be made only after a "thorough evaluation and complete inventory of needs and available land." But this reasoning obfuscates the distinction between a variance and an amendment to the zoning ordinance. Presumably, the local board would find that a variance request for any use which is not specifically mentioned in the zone plan should be provided for only by amending the ordinance.

Moreover, the above finding indicates that the Board never even considered whether there was a regional need for housing; its assessment of the negative criteria was limited by the illegal intent and purpose of the plan which it attempted to follow. Its reasoning is aptly summarized by the Appellate Division:

> [G]iven the zoning ordinance of the municipality, which completely excludes multi-family dwellings from within the municipality, no board of adjustment or governing body could find with any degree of candor or legal propriety that the grant of a variance to construct a complex of multi-family dwellings 'will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'
>
> [Slip opinion at 2.]

Yet the effect that a variance will have on the "intent and purpose of a zone plan" is irrelevant when that plan is exclusionary in character. Nothing in the statutory language suggests that the variance procedure should be used as a way of maintaining an illegal zoning scheme; it should be read as referring to a plan designed in accordance with the zoning purposes enumerated in *N. J. S. A.* 40:55–32.

Both the Appellate Division and today's majority rule out any possibility of a (d) variance for multi-family housing in municipalities which are exclusionary. But the variance procedure should not permit or require communities to blindly follow zoning plans which were adopted without a

realistic appraisal of regional needs, and which still fail to provide for the general welfare of the region. Today's decision clearly contravenes our holding in *Kunzler v. Hoffman, supra,* that variance decisions should be made on the basis of regional needs. See *ante* at 551 (Pashman, J., dissenting).

Nowhere has the local board indicated that it considered the standards embodied in *N. J. S. A.* 40:55–32 in deciding plaintiff's variance request. But these standards are critical to the constitutionality of the statute. In *Ward v. Scott,* 11 *N. J.* 117 (1952), the Court upheld the variance provisions of the zoning statute against a challenge that the Legislature has failed to provide adequate standards to guide local officials in ruling upon variances. In commenting upon the standards specifically related to the variance sections, Justice Jacobs stated:

. . . the Legislature has not in any sense granted uncontrolled power to the administrative agency. It expressly set forth in *R. S.* 40:55–32 the proper zoning purposes to be achieved including the lessening of congestion, the securing of safety from fire, panic and other dangers, the providing of adequate light and the prevention of overcrowding, the avoidance of undue concentration of population, and the promotion of health, morals or general welfare. * * * [A]ccordingly, it wisely adopted the policy expressed in *R. S.* 40:55–39 which enables individual variances consistent with the public interest and the purposes of the zone plan and zoning ordinance.
[11 *N. J.* at 125–26.]

Today's decision encourages local zoning boards to dispense with specific reasons for denying variances, and will inevitably result in *all* variance denials being based upon the magic incantation that the variance would "substantially impair the intent and purpose of the zone plan." This excessive discretion of local officials defeats the fact that zoning is intended to further the goals which the Legislature has enumerated in *N. J. S. A.* 40:55–32 and which the Court reiterated in *Ward v. Scott, supra.* Included among those purposes are "the promotion of health, morals or general welfare." The majority forgets that even though the

means available for meeting the "general welfare" are broad, that term is not devoid of meaning. As Justice Proctor stated in *Kohl, supra*:

> While our courts have recognized that the determinations of the local governing bodies are not to be viewed with a general feeling of suspicion and are not to be overturned unless arbitrary or unreasonable, they have consistently required that local zoning action comply with the statutory requirements. See *Andrews v. Ocean Twp. Board of Adjustment*, 30 *N. J.* 245, 249 (1959).
>
> \* \* \* \* \* \* \* \*
>
> No more specific standards for special reasons have been given by our courts beyond those general standards of [*N. J. S. A.* 40:55–32]. Because of the nature of the subject no precise formula is feasible and each case therefore must turn on its own circumstances. *Andrews, supra* at 251. *However, the lack of a precise formula does not mean that carte blanche has been given to local governing bodies in finding special reasons for the grant of variances.*
>
> [50 *N. J.* at 275–76; emphasis added.]

Yet, today's majority does precisely what we were warned against in *Kohl, supra;* it gives "carte blanche" to the local governing body in assessing the negative criteria under the statute.

I would hold that where, as in this case, a variance is sought for a use which has been found to substantially further the general welfare of the region, a municipality must demonstrate unique or special circumstances which would justify denying the variance request. My proposal is hardly novel. In *Mt. Laurel* the Court concluded that Mt. Laurel's zoning ordinance was "presumptively contrary to the general welfare and outside the intended scope of the zoning power." 67 *N. J.* at 185. We concluded that "[a] facial showing of invalidity is thus established, shifting to the municipality the burden of establishing valid superseding reasons for its action and non-action." *Id.* We deal here with a facet of the same problem — the municipality, through its variance decision, has failed to provide anywhere for meeting the needs of the general welfare.

Unless there are convincing, specific reasons which justify its denial of plaintiff's request, Demarest's decision to deny

the variance would constitute an abuse of power. Discretion which has been accorded to local planning officials should not be used as a means of ignoring the problems of exclusionary zoning. Rather, where a community fails to provide for multi-family housing anywhere within its municipal boundaries, a court should require strict adherence to the statutory purposes of the zoning power embodied within *N. J. S. A.* 40:55–32.

## III

### *THE (d) VARIANCE AS A REMEDIAL MEASURE*

Little has been accomplished since our decision in *Mt. Laurel;* the Court still has not provided adequate remedies for the problems of exclusionary zoning. *See Oakwood at Madison v. Tp. of Madison, supra,* 72 *N. J.* at 559–560 (Pashman, J., concurring and dissenting). In *Oakwood at Madison v. Tp. of Madison, supra,* I outlined the dilatory tactics which communities continue to utilize in thwarting judicial efforts to eliminate exclusionary planning techniques *id.* at 563–571 (Pashman, J., concurring and dissenting), and listed cases documenting the ability of municipality's to avoid their duty to zone for low or middle income residents. *Id.* at 569. The majority hinders efforts to implement its own decision in *Mt. Laurel.* Municipalities must be required to follow concrete guidelines in determining variance applications if we are to be at all successful in providing housing for low and moderate income persons.

Often variance procedures are one of the only ways that a developer can obtain permission to build multi-family housing. Consequently, there is a very real need for judicial guidance to prevent abuses of the variance power. A report prepared by the New Jersey County and Municipal Government Study Commission reviewed local housing regulations in the 27 municipalities which contained over 40% of the multi-family units authorized in the State during the period 1965 to 1972. Only four of these municipalities, all older and highly developed, had a formal multi-family zone.

*Housing & Suburbs: Fiscal and Social Impact of the Multi-Family Development* 112 (1974). Significantly, the remaining 23 communities, located in rural and suburban areas, relied upon the use variance, the special exception variance, or zoning amendments to provide multi-family housing. *Id.* The study outlined the danger inherent in a system which is subject to the uncontrolled discretion of local officials in granting variances. The Commission noted that variances tend to be based upon "the desire to use the planning process as a means of controlling social issues and promoting the suburban self-image, both of which are external to the formal legal planning process." *Id.* at 113–114.

Although (d) variances should not be substituted for a requirement that municipalities create multi-family zones, they should be available for persons wishing to develop land for multi-family housing in communities which persistently refuse to zone for low and moderate income housing. The (d) variance should offer potential builders an assurance that they will be able to actually develop the land. Litigants who have succeeded in striking down exclusionary ordinances have often found that the new plan does not re-zone their property to permit multi-family housing. See Hyson, "The Problem of Relief in Developer-Initiated Exclusionary Zoning Litigation," 12 *Urban L. Ann.* 21, 28–30 (1976) noting that "[n]o developer will initiate a challenge if its only effect will be to make someone else's land available for high density development."[3]

---

[3] I noted in *Oakwood at Madison v. Tp. of Madison, supra,* the experience of land developers in three landmark Pennsylvania cases, two of which never were able to utilize their victories in striking down exclusionary ordinances as a way of building multi-family housing. *Id.,* 72 *N. J.* at 567–568, referring to *Appeal of Girsh,* 437 *Pa.* 237, 263 *A.* 2d 395 (Sup. Ct. 1970) and *National Land and Investment Co. v. Easttown Tp. Bd. of Adjustment,* 419 *Pa.* 504, 215 *A.* 2d 597 (Sup. Ct. 1965). The third landmark case, *Appeal of Kit-Mar Builders, Inc.,* 439 *Pa.* 466, 268 *A.* 2d 765 (Sup. Ct. 1970), resulted in a subdivision approval for the requested development more than two years after the land developer had "won his victory" in the Pennsylvania Supreme Court.

The role of the local governing body in the companion case, *Pascack Ass'n, Limited v. Mayor & Council of Washington Tp.*, 74 *N. J.* 470, demonstrates the need for remedies which provide specific relief. Partly because the zoning ordiance "failed to make any provision for multi-family or rental-type housing," the trial court struck down the local zoning plan. *Pascack Ass'n, Limited v. Mayor & Council of Washington Tp.*, 131 *N. J. Super.* 195, 197 (Law Div. 1974). Although the township amended its zoning ordinance to allow multi-family housing, the practical effect of restrictions within the amendment made development of multi-family housing impossible. Nearly 27 of the 34 acres rezoned for multi-family housing consisted of land which had already been committed to uses which foreclosed multi-family development. Additionally, the amendment imposed restrictions involving lot size, unit density, minimum floor areas, and bedroom and bathroom limitations.

Although not addressing itself specifically to the situation in *Washington Township,* the Court in *Oakwood at Madison v. Madison Tp., supra,* recognized the necessity of some form of specific relief other than a judicial order to rezone:

> A consideration pertinent to the interests of justice in this situation, however, is that corporate plaintiffs have borne the stress and expense of this public-interest litigation, albeit for private purposes, for six years and have prevailed in two trials and on this extended appeal, yet stand in danger of having won but a pyrrhic victory. A mere invalidation of the ordinance, if followed only by more zoning for multi-family or lower income housing elsewhere in the township, could well leave corporate plaintiffs unable to execute their project. There is a respectable point of view that in such circumstances a successful litigant like the corporate plaintiffs should be awarded specific relief.
>
> [72 *N. J.* at 549.]

Though in *Oakwood at Madison v. Madison Tp., supra,* the Court indicated its willingness to impose strong measures to insure a plaintiff the right to build multi-family housing, it ignored a simpler, yet equally effective solution. By requiring municipalities to strictly adhere to the variance

procedure in the future, the Court might save future plaintiffs the time, expense, and delay of going to court to obtain what the variance procedure intended in the first place. Unfortunately, the Court today nullifies that possibility by allowing municipalities, in the exercise of their "discretion," to summarily reject variances.

Perhaps the overriding reason for the majority's decision today is the fear that the (d) variance will become an instrument for undesirable change; developers will succeed in convincing courts that any use which slightly benefits the general welfare deserves a variance, even though it would be more appropriately put somewhere else. See *ante* at 535–536. In fact, the majority cites one commentator for the proposition that

[g]ranting such variances 'largely on the basis of the absence of negative findings, would result in arbitrary changes in the use of land, precluding serious planning for services, facilities, traffic circulation and other community needs.' Mallach, "Do Lawsuits Build Housing?: The Implications of Exclusionary Zoning Litigation," 6 *Rutgers-Camden L. J.* 653, 659 (1975).

The majority's fear of the (d) variance is the consequence of its own failure to adequately define the negative criteria in the statute. In the instant case, the majority upholds the local board's conclusion that the negative criteria are sufficiently offended, even though no possible adverse effects upon the community have been proven and the board's findings are no more than a recital of the negative criteria. Nevertheless, the majority argues that these same criteria would be ineffective in preventing "arbitrary changes in the use of land, precluding serious planning for services, facilities, traffic circulation and other community needs." The criteria themselves cannot account for the haphazard conclusions; rather, it is the majority's disparate treatment of those standards which cause the contradictory results.

The majority goes a long way today toward negating the effectiveness of the (d) variance by substituting the discre-

tion of local officials for the limitations inherent in the legislation. As a result of today's decision, it is unlikely that the negative criteria will have any uniform meaning but will instead depend on the whim of each local planning board. Unfortunately, the definition which a board will accord those criteria is likely to depend, in large part, on whether it is being confronted with a request for low or middle income housing.

## IV

## CONCLUSION

Today's decision by the Court will neither further the legislative intent in enacting the (d) variance nor provide any remedy for exclusionary zoning. Instead, it merely reinforces the unbridled power which is currently exercised by local governing bodies — including the ability to pass exculsionary zoning measures and to needlessly restrict housing development. Contrary to the expressed purpose of zoning and the (d) variance, the majority today legitimates planning decisions based on exclusionary principles, and relegates the zoning purposes which the Legislature specifically enacted within *N. J. S. A.* 40:55-32 to secondary importance.

I would reverse the judgment of the Appellate Division and require the local board to grant plaintiff's variance.

SULLIVAN and SCHREIBER, JJ., concurring in the result.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For reversal*—Justice PASHMAN—1.